# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**LARRY HAYES,**

      **Petitioner,**

**v.**                                          **Case No. 2:15-cv-15636**

**MARVIN C. PLUMLEY, Warden,**
**Huttonsville Correctional Complex,**

      **Respondent.**


### PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court are Petitioner's *pro se* Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 2), and Respondent's Motion for Summary Judgment, (ECF No. 9). This case is assigned to the Honorable Thomas E. Johnston, United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). As a preliminary matter, the undersigned notes that the record before the Court is well-developed and provides a sufficient basis upon which to resolve this case without need for an evidentiary hearing. *See* Rule 8, Rules Governing Section 2254 Cases.

After thorough consideration of the record, the undersigned conclusively **FINDS** that (1) there are no *material* factual issues in dispute and (2) Petitioner is not entitled to the relief requested. Therefore, for the reasons that follow, the undersigned

1

respectfully **RECOMMENDS** that the District Court **GRANT** Respondent's Motion for Summary Judgment; **DENY** Petitioner's Petition for a Writ of Habeas Corpus; and **DISMISS** this case from the docket of the Court.

I.  **Relevant Facts and Procedural History**

   **A. Indictment, Trial, and Direct Appeal**

In January 2011, Petitioner Larry Hayes ("Hayes") was indicted by a Kanawha County, West Virginia grand jury on one count of death of a child by a parent, guardian, or custodian by abuse, contrary to West Virginia Code § 61-8D-2a. (ECF No. 9-1 at 2-3). The indictment alleged that, in September 2010, Hayes "unlawfully, feloniously, maliciously[,] and intentionally" harmed R.M., his girlfriend's eighteen-month-old daughter, causing her death.[1] (*Id.* at 3, 127).

Prior to Hayes's trial, he was interviewed on two separate occasions by several officers from the South Charleston Police Department. The first interview occurred on October 1, 2010 in the kitchen area of the South Charleston Police Station, which was located in close proximity to the home where Hayes, R.M., and R.M.'s mother, M.B., resided at the time of R.M.'s death. (ECF No. 9-6 at 140-42). Hayes agreed to accompany South Charleston Police Detectives Benjamin Paschall and Charles Cook to the police station after the detectives arrived at his home and asked him to walk over to the station to discuss R.M.'s injuries. (*Id.* at 142-43). Shortly before their initial contact with Hayes, the detectives had visited the hospital where R.M. was being treated and learned from medical personnel that R.M.'s injuries were non-accidental. (*Id.*) During the first interview, Hayes indicated that he spent the day on September 30

---

[1] Pursuant to Local Rule of Civil Procedure 5.2.1(a), the undersigned refers to the minor victim by her initials. The undersigned also refers to the minor victim's mother by her initials.

watching R.M. and that the day was normal. (ECF No. 9-7 at 131). Hayes reiterated this story at a subsequent interview on October 2 with a Child Protective Services worker, during which Detective Paschall was present. (*Id.* at 132-33, 153-54; ECF No. 9-3 at 34-35).

Hayes's second interview with the police took place on October 4, 2010, the day after R.M. was removed from a ventilator because she had no brain activity. (*Id.* at 103, 111; ECF No. 9-1 at 129). Detective Paschall and Detective Andrew Gordon traveled to Hayes's residence and asked Hayes to walk to the station to speak with them. (ECF No. 9-6 at 155-56). Hayes agreed and walked with the detectives back to the police station. (*Id.* at 156). According to Detective Paschall, Hayes did not advise the detectives that he did not want to speak with them or that he desired an attorney, and Hayes appeared to be "of sound mind and body." (*Id.*) Hayes was not placed in handcuffs prior to or during the walk to the police station. (*Id.*) The interview again took place in the kitchen of the South Charleston Police Department and was conducted by Detectives Paschall and Gordon, who were joined by South Charleston Police Detectives Joel Gray and Cook. (*Id.* at 156, 171). At the outset, Detective Paschall informed Hayes that he was a suspect in R.M.'s death, and Detective Gordon read Hayes his *Miranda*[2] rights and filled out a notification and waiver of rights form, which Hayes signed. (ECF No. 9-2 at 129-31). Detective Gordon also informed Hayes that he was not under arrest and that he was free to leave at any time. (*Id.* at 130-31).

After signing the waiver of rights form, Detective Paschall asked Hayes to describe the events of September 30, 2010, the day that R.M. was hospitalized. (*Id.* at

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

131). Hayes explained that he and M.B. awoke R.M. that day around 7:30 a.m., and R.M. was acting normal. (*Id.* at 131-32). The three drove to IHOP, where M.B. worked, and dropped off M.B. at approximately 8:10 a.m. (*Id.* at 131-32, 134). Hayes and R.M. returned home at approximately 8:30 a.m., and Hayes carried R.M. upstairs to put her down for a nap. (*Id.* at 132). R.M. awoke from her nap between 11:00 and 11:30 a.m., and the two played an Xbox game together. (*Id.* at 133). Hayes then played on the living room floor with R.M., and they ate lunch together around noon. (*Id.*) After eating, the two continued playing until M.B. texted Hayes and told him that she was going to be off of work at 2:00 p.m. (*Id.* at 134). Hayes began to get ready for work upstairs with R.M. nearby. (*Id.*) He then carried R.M. downstairs, dressed her, and placed her in the car. (*Id.*) At that time, R.M. was conscious. (*Id.* at 143). During the car ride, Hayes looked back and saw R.M. slumped over. (*Id.* at 134). He tried to rouse her to no avail. (*Id.*) At that point, Hayes called M.B. while entering the IHOP parking lot and told M.B. to come outside. (*Id.*) After he got R.M. out of her car seat, M.B. took R.M. and placed her on the sidewalk. (*Id.*) Thereafter, fire department workers responded and picked up R.M. to transport her elsewhere. (*Id.*)

Detective Paschall inquired whether Hayes knew the extent of R.M.'s injuries, and Hayes responded that he knew R.M. had a skull fracture. (*Id.* at 135). When asked how R.M. received the skull fracture, Hayes indicated that R.M. had fallen off of some steps in the home three or four days before she was hospitalized, but she was acting normal on September 30. (*Id.* at 135-36). Detective Gordon then pressed Hayes to tell him what really happened and repeatedly assured Hayes that "good people make mistakes all the time." (*Id.* at 137). Hayes insisted that he had told the detectives the truth and that he did not hurt R.M. (*Id.*) Hayes accused the detectives of attempting to

4

get him to lie and to admit to doing something to R.M. that he did not do. (*Id.* at 139). Detectives Paschall and Gordon replied that Hayes should not lie. (*Id.*)

Subsequently, Detectives Cook and Gray entered the kitchen area, and Detective Cook informed Hayes that he had attended R.M.'s autopsy that morning and he wanted to know from Hayes what happened to R.M. (*Id.* at 142). Hayes maintained that he had told the truth, to which Detective Cook responded, "You're telling me that's going to be your story?" (*Id.*) Detective Cook added that he was "one hundred percent sure" that Hayes caused R.M.'s death and that the "[o]nly thing we can do is start right now and start doing damage control." (*Id.*) Hayes continued to assert that he was telling the truth, at which time Detective Cook called Hayes a liar. (*Id.* at 147). Shortly thereafter, Detective Cook remarked, "I feel confident that you didn't do this on purpose which to me makes a big difference." (*Id.* at 150). Later during the questioning, Detective Cook told Hayes, "If it's an accident, we would deal with it. Accidents happen all the time," to which Hayes retorted, "And you'd still put me jail." (*Id.* at 155). In response, Detective Cook stated, "That is not true. If an accident happened, an accident happened. ... There's a difference between an accident and something with malice." (*Id.*) Detective Gray joined in, "[T]here's a difference between a cold blooded killer and somebody who had an accident. ... [T]he prosecutor who['s] the first step in deciding what's gonna' be done with you, looks at that seriously. ... [A]nd the only thing they have to look at right now, all the evidence says this guy's a cold blooded killer who doesn't care what he did." (*Id.*) Hayes asked the detectives what would happen if he told them that he "did something," and Detective Gray informed Hayes that he would be processed and brought before a magistrate; Hayes would then "work it out with the prosecutor." (*Id.* at 156). Detective Gray warned that if Hayes told the detectives

nothing, then he would be charged as a "cold blooded killer." (*Id.* at 156-57).

Hayes then asked Detective Cook what would happen if R.M.'s death were an accident. (*Id.* at 161). Detective Cook responded, "If it was a hundred percent an accident, you would probably be free to leave once it's dealt with. You might get charged with lying to us at the beginning of this because ... you shouldn't have done that." (*Id.*) Detective Cook mentioned that it was "more than likely" that Hayes would be leaving the station in handcuffs that day given R.M.'s injuries. (*Id.*)

Detectives Gray and Cook subsequently took Hayes out for a cigarette break and walked him across the street to the building where the Detective Bureau was located. (*Id.* at 161). The detectives continued to ask Hayes to "come clean" and told him that he would feel relief if he told the truth. (*Id.* at 164). Approximately ninety minutes into the second interview, Hayes stated that, before leaving to pick up M.B. on September 30, he tripped while descending the stairs with R.M. in his arms and landed on her. (*Id.* at 164; ECF No. 9-7 at 23-24, 133). Hayes explained that he fell from the third or fourth step and that he landed "flat" on top of R.M.; however, according to Hayes, she was acting normal when he placed her in the car. (ECF No. 9-2 at 164-65). Hayes then acknowledged that he knew R.M. was not "alright," but he thought she would be fine. (*Id.* at 166). He also indicated that he did not call 911 or take R.M. to the hospital because he was scared. (*Id.* at 166-67). When asked how he fell, Hayes described falling onto his legs and hitting his head. (*Id.* at 168). After additional questioning about Hayes's fall while holding R.M., Hayes asserted that the fall occurred from the fifth or sixth step and that R.M. cried for a few seconds after the fall. (*Id.* at 176). During the drive to IHOP, Hayes noticed that R.M. was bleeding from her nose. (*Id.* at 177). At the conclusion of the two and one-half hour interview, Hayes and the detectives departed

so that Hayes could demonstrate how he fell at his home while being video recorded. (*Id.* at 183, 187-88).

Hayes's trial counsel moved to suppress the statement given by Hayes on October 4. The trial court held a suppression hearing on August 22, 2011. At the hearing, Detective Paschall testified that during the October 4 interview, Hayes was informed he was being questioned concerning R.M.'s death and advised of his *Miranda* rights. (ECF No. 9-3 at 41). Detective Paschall indicated that Hayes signed a waiver of rights form before the questioning began. (*Id.* at 42). A recording of the interview was introduced through Detective Paschall. (*Id.* at 44-45). Hayes's counsel argued that the statement should be suppressed because Hayes was coerced into fabricating a story about an accident occurring that resulted in R.M.'s death. (*Id.* at 46-47, 69-70, 105, 109). The trial court rejected defense counsel's argument and denied the motion. (ECF No. 9-4 at 37, 56-57; ECF No. 9-1 at 109).

Hayes's trial began on August 23, 2011. The State's first witness was M.B. She testified that she was dating and living with Hayes in September 2010. (ECF No. 9-5 at 63). Hayes would watch R.M. while M.B. was at work. (*Id.* at 67). M.B. indicated that when R.M. would get hurt, she was able to communicate where she was hurt. (*Id.*) She recalled that R.M. was happy on the morning of September 30 when Hayes dropped M.B. off for work. (*Id.* at 69). M.B. sent a text message to Hayes that day informing him to pick her up in the afternoon. (*Id.* at 73). M.B. recounted Hayes calling her as he was pulling into the parking lot and asking her to come outside because something was wrong with R.M. (*Id.* at 73-74). M.B. went outside to Hayes's vehicle, and she took R.M. from Hayes and placed her on the ground to perform CPR. (*Id.* at 75). M.B. testified that R.M.'s lips were blue, she felt cold, and she was not breathing. (*Id.*) M.B.

remembered that R.M. was not wearing the pajamas that she had been wearing in the car that morning, which M.B. described as unusual since R.M.'s clothes were not typically changed unless she was bathed and Hayes did not bathe her that day.[3] (*Id.* at 82). M.B.'s coworker, Lamar Mosley, called 911, and fire department workers arrived in a matter of minutes to transport R.M. (*Id.* at 74, 84). R.M. was taken to Thomas Hospital, and Hayes and M.B. followed. (*Id.* at 85). During the drive to the hospital, M.B. asked Hayes what happened. (*Id.*) Hayes responded that it had been a normal day. (*Id.*) At Thomas Hospital, R.M.'s pulse returned, but she was unable to breath on her own, and she was placed on a ventilator. (*Id.* at 86). After approximately two hours at Thomas Hospital, R.M. was transferred to CAMC's Women and Children's Hospital in Charleston, West Virginia. (*Id.*) While at Women and Children's Hospital, M.B. learned that R.M. had a skull fracture. (*Id.* at 88). She was also informed that R.M. had no brain activity. (*Id.* at 89). R.M. was taken off of the ventilator on October 3. (*Id.*)

M.B. also testified about an incident involving R.M. on September 24, 2010 when R.M. was sitting on the bottom step of the stairs in their home playing with toys. (*Id.* at 93). As R.M. attempted to get up from the step, she fell backwards and landed on her bottom. (*Id.* at 98). Behind R.M. was a child's four-wheeler toy, but M.B. did not witness the four-wheeler toy move. (*Id.*) She also did not see R.M. hit her head during the fall, and R.M. did not act as if her head hurt afterward. (*Id.*) Although R.M. cried after the fall, she acted "fine" once M.B. picked her up. (*Id.*)

The following day, M.B. took R.M. to an urgent care center because R.M. was not putting any weight on one of her legs. (*Id.* at 99-100). M.B. testified that medical

---

[3] M.B. later found R.M.'s pajamas in the washer, and they were damp and mildewed. (ECF No. 9-5 at 83).

personnel checked R.M.'s pupils and that there was no indication by the medical staff that there was anything wrong with R.M.'s head. (*Id.* at 100). X-rays of R.M.'s knee were taken at that visit. (*Id.* at 101). The next day, R.M. was still not placing any weight on her leg, and so, M.B. took her to the emergency room. (*Id.* at 102). At that time, M.B. testified that R.M. did not act like anything was wrong with her head. (*Id.* at 103). M.B. did not recall R.M. acting differently other than her leg issue. (*Id.* at 103-04). Between September 24 and September 30, M.B. bathed R.M. each night and did not notice any physical deformity with respect to her head. (*Id.* at 109-10). In addition, M.B. stated that she did not witness R.M. have any other incidents of falling after September 24. (*Id.* at 118-19).

On cross-examination, M.B. acknowledged that she told police that she was unsure whether R.M. hit her head when she fell from the step on September 24. (*Id.* at 142-43). M.B. elaborated that she also told medical personnel the same thing on September 25 and 26, which led to them checking R.M.'s pupils. (*Id.* at 143). According to M.B., the medical staff did not have any concern about an injury to R.M.'s head after examining her pupils, and as such, they did not perform an x-ray, MRI, or CAT scan on R.M.'s head. (*Id.*) M.B. also testified that she did not recall seeing blood on R.M.'s face until she began performing CPR, at which time R.M. began to bleed from her nose and mouth. (*Id.* at 149).

The State's next witness was Mr. Mosley, who worked at IHOP with M.B. On September 30, 2010, Mr. Mosley recalled exiting the IHOP and seeing R.M. lying on the ground outside of the restaurant surrounded by M.B. and Hayes. (*Id.* at 163-64). Mr. Mosley described R.M. as looking "real pale in the face" and "almost purple." (*Id.* at 164). He recounted Hayes performing CPR on R.M., and during the attempt to

resuscitate R.M., Mr. Mosley witnessed a "ball of blood" leave R.M.'s mouth. (*Id.* at 164, 170).

The State also called Allen Mock, M.D., a Deputy Chief Medical Examiner for the West Virginia Office of the Chief Medical Examiner. (*Id.* at 182; ECF No. 9-6 at 98-99). At the time of Hayes's trial, Dr. Mock had worked approximately one year for that office. (ECF No. 9-5 at 182-83). Dr. Mock testified that he received his medical degree from Louisiana State University and trained in anatomic and forensic pathology at the University of Tennessee. (*Id.* at 183). He also trained in forensic pathology at the New Mexico University Office of the Chief Medical Investigator. (*Id.*) Dr. Mock explained that prior to working for the West Virginia Office of the Chief Medical Examiner, he was in fellowship training, and before his fellowship training, he was employed as an assistant medical examiner in Tennessee. (*Id.*) As for certifications, Dr. Mock testified that he was board eligible in the American Board of Pathology for both anatomic and clinical pathology and that he was taking a certification for anatomic pathology in October 2011. (*Id.* at 184; ECF No. 9-6 at 10). As of the time of his testimony, Dr. Mock had taken and passed the clinical pathology examination administered by the American Board of Pathology. (ECF No. 9-6 at 12). Dr. Mock denied previously taking the anatomic pathology examination. (*Id.*) After describing his education and experience, the State moved for Dr. Mock to be recognized as an expert in forensic pathology, to which the defense did not object. (ECF No. 9-5 at 186, 188).

Dr. Mock performed R.M.'s autopsy on the morning of October 4, 2010, approximately twenty-three hours after R.M. was pronounced dead. (*Id.* at 188-89, 193). Dr. Mock's external examination of R.M. revealed dot-like bruises and two small abrasions on R.M.'s left forehead as well as bruising about her mid forehead. (*Id.* at

198). Dr. Mock also observed a faint contusion and edema in the skin around R.M.'s right eye along with a laceration and bruise on the inside of R.M.'s upper lip. (*Id.* at 198-99, 202). On the back of R.M.'s head, Dr. Mock identified a two-inch bruise, and behind R.M.'s ears, Dr. Mock noted bruising as well. (*Id.* at 205). On internal examination of R.M.'s head, Dr. Mock observed subscalpular hemorrhages, subgaleal hemorrhages, and edema. (*Id.* at 214). When examining the back of R.M.'s skull, Dr. Mock found a five and one-quarter inch skull fracture near the middle of the skull. (*Id.* at 215-16). The fracture encompassed approximately twenty-five percent of the circumference of R.M.'s skull. (*Id.* at 216). After grossly examining the fracture, Dr. Mock saw no evidence of healing in the fracture. (*Id.* at 224). Dr. Mock testified that, if he had observed signs of healing, then he would have taken samples of the skull or surrounding tissue to perform additional studies. (*Id.* at 225). When asked how much force would be required to produce such a fracture, Dr. Mock responded that a significant amount of force would be necessary and that a skull fracture as extensive as R.M.'s would typically be seen in "high energy motor vehicle accidents." (*Id.* at 247-48). In addition to the skull fracture, Dr. Mock noted acute subdural and subarachnoid hemorrhages and that R.M.'s brain was severely swollen. (*Id.* at 225-35). Regarding R.M.'s eyes, Dr. Mock observed bleeding into the optic nerve sheath, caused by intracranial pressure, and retinal hemorrhaging in both eyes. (*Id.* at 242-43). As for any additional testing that Dr. Mock performed, he testified that he performed microscopic examinations and iron staining on various tissue samples, which confirmed that R.M.'s injuries were acute. (*Id.* at 245-46). Dr. Mock indicated that his findings were consistent with a closed head injury. (*Id.* at 248-49). He also concluded that neither the September 24 incident nor the September 30 fall described by Hayes

could have caused R.M's injuries. (*Id.* at 249-50). As to the cause of R.M.'s death, Dr. Mock opined that R.M. died as a result of blunt force injuries to her head. (*Id.* at 254). Additionally, Dr. Mock opined that R.M.'s death was a homicide. (*Id.* at 255). Dr. Mock's autopsy report containing these findings was cosigned by James Kaplan, M.D., the Chief Medical Examiner for West Virginia. (*Id.* at 192).

On cross-examination, Dr. Mock acknowledged that he was "very new" in his career at the time that he performed R.M.'s autopsy. (ECF No. 9-6 at 14). Continuing on the subject of his experience, Dr. Mock testified that, at the time R.M.'s autopsy, he had performed approximately ten autopsies on children under the age of two where the cause of death was abuse. (*Id.* at 36). He stated that he was unsure as to how many of those cases involved skull fractures, but he estimated between five and ten. (*Id.* at 37). Of those five to ten cases, Dr. Mock was uncertain that any involved a healing skull fracture. (*Id.*) Turning to his specific findings in R.M.'s case, Dr. Mock stated that his opinion as to whether the September 24 incident could have caused R.M.'s injuries was based on photographs and information that he was told by the police. (*Id.* at 30-31). Dr. Mock testified that he did not review M.B.'s statement regarding the September 24 incident before performing the autopsy, and he conceded that information about a prior potential head injury would be important when writing his autopsy report. (*Id.* at 33). However, Dr. Mock denied that it was necessary for him to take samples from R.M.'s skull fracture to determine the fracture's age. (*Id.* at 34). Although Dr. Mock admitted that "very few gross observations are definitive," he maintained that his gross observation of the fracture indicated that taking a sample of the bone and examining it under a microscope was unnecessary. (*Id.* at 38, 49). Dr. Mock noted that the "arguabl[e] best practice is to take samples of everything," but that was "not practical."

(*Id.* at 39). Additionally, Dr. Mock testified that certain falls backwards or on carpeted floors could cause a skull fracture. (*Id.* at 55). As to the cause of R.M.'s injuries, Dr. Mock opined that it was "more than probable" that the injuries were a result of abuse. (*Id.* at 83). Notwithstanding, without the additional information received from witness reports, law enforcement, and R.M.'s medical records, based on the physical findings alone, Dr. Mock indicated that it was possible R.M.'s death was accidental. (*Id.* at 125). On redirect examination, Dr. Mock testified that the iron stain test results indicated that R.M.'s injuries occurred in close temporal proximity to her hospital admission. (*Id.* at 101).

Detective Paschall also testified for the State. He recalled learning that R.M.'s injuries were non-accidental from medical personnel and speaking with Hayes on October 1, 2010. (*Id.* at 143). A recording of that first interview was introduced into evidence. (*Id.* at 145-46). Detective Paschall also remembered being present for an interview conducted by a Child Protective Services worker on October 2 at Hayes's home. (*Id.* at 153-54). At that interview, Hayes's story remained the same. (*Id.* at 154). In addition, Detective Paschall recounted the October 4 interview with Hayes, and the State played nearly the entirety of that interview for the jury. (*Id.* at 163-64, 166; ECF No. 9-7 at 6). After the interview, Paschall and other detectives walked to Hayes's residence and video recorded a reenactment of the fall described by Hayes at the interview. (*Id.* at 7). The video recording was introduced into evidence and played for the jury. (*Id.* at 8-9).

On cross-examination, Detective Paschall testified that he was unsure whether R.M.'s skull fracture occurred on September 30 when she was alone with Hayes. (*Id.* at 21). Detective Paschall also acknowledged that Hayes's story was consistent across

13

interviews until approximately ninety minutes into the October 4 interview. (*Id.* at 23, 27). Detective Paschall stated that Hayes insisted September 30 was a normal day until he changed his story at the second police interview. (*Id.* at 27-29). Detective Paschall added that he was unaware of any previous reports of Hayes acting violently toward R.M. and that he did not know what specifically caused R.M.'s skull fracture. (*Id.* at 34-35, 48-49). On redirect examination, Detective Paschall testified that he had found no evidence that anyone else was around R.M. on September 30 and that no other reports of R.M. falling before that day were relayed to him. (*Id.* at 42).

The State's next witness was Hayes's father, Larry Hayes, Sr. Mr. Hayes testified that he received a phone call from Hayes on October 5, 2010 after Hayes was arrested. (*Id.* at 61-63). The State played a recording of a portion of that phone call for the jury. (*Id.* at 64). While a transcription of the recording is not in the record, in arguing over the admissibility of the recording, the State represented that Hayes told his father "I didn't mean to hurt her like that," and that "it was an accident." (*Id.* at 52).

The State next called Detective Cook, who testified about his investigation in the case. Detective Cook recalled photographing the stairs at M.B.'s and Hayes's home, and he measured that the bottom stair that R.M. fell from was six and one-half inches from the ground. (*Id.* at 96-99). He also photographed Hayes's head on October 1. The photographs did not depict that Hayes had any bump on his head, contrary to what he told the detective during the second police interview. (*Id.* at 94-95) Detective Cook testified that he executed a search warrant on Hayes's car and observed what appeared to be blood stains on R.M.'s car seat. (*Id.* at 102-03). During a search of the home, Detective Cook was unable to identify any bodily fluids using an alternate light source. (*Id.* at 113). Like Detective Paschall, Detective Cook remembered that Hayes repeatedly

asserted that September 30 was a normal day until approximately ninety minutes into the second police interview. (*Id.* at 130-33). On cross-examination, Detective Cook conceded that he did not know how R.M. obtained her skull fracture. (*Id.* at 144).

The State's final witness was Manuel Caceres, M.D., a pediatrician working at Women and Children's Hospital when R.M. was admitted on September 30, 2010. Dr. Caceres remembered receiving information from Thomas Hospital about R.M.'s condition before her transfer. Upon arriving at Thomas Hospital, R.M. was in full cardiac arrest. (*Id.* at 152). R.M. was resuscitated at Thomas Hospital, but she was "in [a] coma, basically." (*Id.* at 151-52). Dr. Caceres spoke with Hayes at Women and Children's Hospital, and he indicated that R.M. was playful and healthy during the day. (*Id.* at 156). After stabilizing R.M., Dr. Caceres ordered a CT scan of R.M.'s brain, which was taken within three hours of R.M.'s arrival at Women and Children's Hospital. (*Id.* at 159-60, 164). Reviewing the CT scan, he observed swelling of the brain and suspected that there was a skull fracture. (*Id.* at 160). A preliminary report from a radiologist reviewing the CT scan results indicated that there was no fracture; however, a subsequent review by a pediatric radiologist noted a "pretty large skull fracture posteriorly." (*Id.* at 161-62). Dr. Caceres testified that R.M.'s brain swelling and skull fracture were consistent with head trauma. (*Id.* at 162). In addition to the CT scan, Dr. Caceres ordered an MRI of R.M.'s head. (*Id.* at 166). The MRI revealed generalized brain swelling, a herniation of the cerebellum (where the brain pushes into the lower structures of the body due to swelling), small bilateral subdural hemorrhages, and a skull fracture. (*Id.* at 167-68). Dr. Caceres described the fracture as "very big" and stated that such a fracture in a child was "very rarely" seen, typically in car accidents or where a child has suffered "very significant trauma." (*Id.* at 168-69). As to external

observations, Dr. Caceres noted that R.M. had a bruise near her forehead, and a "pretty large" bruise on the right side of her head that extended to the front under her hairline. (*Id.* at 162-65). Dr. Caceres also indicated that R.M. exhibited bilateral retinal hemorrhaging. (*Id.* at 169-70).

Given these findings, Dr. Caceres opined that R.M.'s condition was consistent with shaken baby or shaken impact syndrome and that R.M.'s injuries were non-accidental. (*Id.* at 170, 176). Dr. Caceres explained that shaken baby syndrome means that a child is shaken with sufficient force to cause an acceleration/deceleration injury to the child's brain, which results in significant brain swelling and hemorrhages. (*Id.* at 170-71). Dr. Caceres further explicated that shaken impact syndrome involves the same type of acceleration/deceleration injury, but the child is also hit against an object causing a fracture. (*Id.* at 171). Dr. Caceres also opined that R.M.'s injuries could not have been caused by the fall that Hayes described to the police on October 4. (*Id.* at 176-77). Additionally, Dr. Caceres testified that R.M.'s skull fracture and brain swelling could not have been caused by the September 24 incident, even if R.M. hit her head on the four-wheeler toy. (*Id.* at 178-80). Dr. Caceres remarked that such a fall could produce a "small fracture," but not the brain swelling and subdural hemorrhages that R.M. exhibited. (*Id.* at 179-80). Moreover, Dr. Caceres indicated that, if the skull fracture he observed were caused during the September 24 incident, R.M. would have acted noticeably different immediately afterward. (*Id.* at 183-84). Lastly, Dr. Caceres testified that he had reviewed the defense's medical expert's opinion, Thomas Young, M.D., as to the cause of R.M.'s death, and he disagreed with the opinion because it was inconsistent with the medical findings. (*Id.* at 190-97).

Before cross-examining Dr. Caceres, defense counsel asked the trial court to enforce a subpoena issued for Dr. Mock. (*Id.* at 200). Defense counsel explained that, after consulting with Dr. Young, he believed that Dr. Mock made a misrepresentation during his testimony. (*Id.* at 203). Specifically, defense counsel asserted that the American Board of Pathology examinations for anatomic and clinical pathology were not two separate tests, but one test with two parts (one for anatomic pathology and one for clinical pathology) that must be taken at the same time. (*Id.*) Because Dr. Mock testified that he had passed the clinical pathology test and was taking the anatomic pathology test at a later date, defense counsel argued that Dr. Mock must have failed the anatomic pathology portion of the examination on his first attempt. (*Id.* at 203-04). Furthermore, defense counsel asserted that Dr. Mock was "an addict" and had medical licensure problems in New Mexico due to his addiction. (*Id.* at 205). The trial court denied defense counsel's request to enforce the subpoena and stated that defense counsel possessed the opportunity to investigate Dr. Mock's credentials before trial began. (*Id.* at 206-07).

On cross-examination, Dr. Caceres acknowledged that there were studies demonstrating that, if a child were shaken severely enough to cause brain damage, then the child's neck would break. (*Id.* at 212). Dr. Caceres conceded that R.M.'s neck was not broken. (*Id.*) However, Dr. Caceres remarked that he disagreed with those studies. (*Id.* at 230). Dr. Caceres also admitted that he was unsure precisely what caused R.M.'s skull fracture. (*Id.* at 231). Although Dr. Caceres noted that R.M. experienced a hypoxic ischemic event and disseminated intravascular coagulation, both of which were key to Dr. Young's opinion, he opined that both of those events occurred after R.M. suffered from head trauma that shortly thereafter caused cardiac arrest, which resulted in a

hypoxic ischemic injury. (*Id.* at 214, 223; ECF No. 9-8 at 4-5). Dr. Caceres added that R.M.'s brain swelling would have started immediately after the head trauma and that the severity of the swelling could not be explained by a hypoxic ischemic injury alone. (ECF No. 9-8 at 5). Lastly, Dr. Caceres noted that the head trauma suffered by R.M. would have occurred within two hours of R.M. entering cardiac arrest. (*Id.* at 2).

The first witness for the defense was Dr. Young, an American Board of Pathology certified forensic pathologist and the former Chief Medical Examiner for Kansas City, Missouri. (*Id.* at 29-30, 37). As a medical examiner, Dr. Young worked on approximately one hundred cases involving children under the age of two with skull fractures and brain injuries. (*Id.* at 36, 41-42). With respect to R.M.'s death, Dr. Young opined that R.M. could have suffered a skull fracture from the September 24 fall, which M.B. and Hayes may not have noticed. (*Id.* at 48-49). Dr. Young testified that, on September 30, R.M. experienced a posttraumatic seizure as a result of the head trauma she suffered on September 24, which caused her to stop breathing and go into cardiac arrest. (*Id.* at 51-52, 59). Dr. Young indicated that the lack of oxygen caused R.M.'s brain to swell and that R.M.'s brain injury combined with the resumption of blood circulation after R.M. was resuscitated caused her brain and scalp to easily bleed. (*Id.* at 54-58).

On the subject of R.M.'s skull fracture, Dr. Young opined that the September 24 fall could have caused the fracture, and in support of his opinion, Dr. Young cited a 2001 study concluding that a child could receive a skull fracture from a two-foot drop. (*Id.* at 70-71). In addition, Dr. Young testified that he looked at a photograph of the skull fracture taken during R.M.'s autopsy, and he determined that the skull fracture was a healing fracture, not a "fresh fracture." (*Id.* at 75-76). Dr. Young noted that the

bleeding in the tissue around the fracture was not bright red, as one would expect with a "fresh fracture"; rather, the tissue around the fracture was "dull, brown, [or] yellowish brown." (*Id.* at 76). Moreover, Dr. Young contended that the difficulty in dissecting the scalp and the presence of hemorrhagic tissue bridging the skull fracture evidenced that the fracture was a healing fracture. (*Id.*) Dr. Young stated that the failure to recognize healing fractures is a common mistake by pathologists and that Dr. Mock should have sampled the area of the fracture to analyze it under a microscope. (*Id.* at 78-79).

As for Dr. Caceres's opinion that R.M.'s condition was consistent with shaken baby or shaken impact syndrome, Dr. Young testified that shaken baby syndrome was "falsified scientifically." (*Id.* at 61). He cited a study that concluded a person could not shake a child with enough force to cause a subdural hematoma or hemorrhage. (*Id.* at 61-63). Furthermore, if such force were exerted on a child, Dr. Young asserted that the child's neck would break. (*Id.* at 64). Dr. Young concluded that R.M.'s death was an accident, not a homicide. (*Id.* at 75).

Defense counsel also attempted to elicit testimony from Dr. Young regarding the American Board of Pathology certification process. (*Id.* at 90). Specifically, Dr. Young was asked to comment on Dr. Mock's testimony that he had taken the clinical pathology examination, but not the anatomic pathology examination. (*Id.*) The State objected, and during a bench conference, defense counsel explained that the purpose of the testimony was to demonstrate that Dr. Mock had failed the anatomic pathology examination on his first attempt, yet, he testified that he had never taken the anatomic pathology examination. (*Id.* at 92). The trial court sustained the State's objection. (*Id.* at 96).

On cross-examination, Dr. Young conceded that in his performance of autopsies on children with skull fractures, he did not always take samples of those fractures; instead, he would sometimes rely on gross observation of the fractures to determine whether they were healing fractures. (*Id.* at 119). In addition, Dr. Young opined that the September 30 fall described by Hayes would not have caused R.M.'s injuries. (*Id.* at 120). Dr. Young also acknowledged that the medical findings concerning R.M.'s condition were consistent with some cases of child abuse. (*Id.* at 142). Dr. Young further admitted that he had performed an autopsy on a child in 1995 and testified at the trial related to that child's death that shaken baby syndrome caused the child's death. (*Id.* at 150-52). Moreover, Dr. Young conceded that he had previously testified that a short distance fall could not cause a skull fracture in a child. (*Id.* at 166). However, Dr. Young indicated that he had changed his opinions on both issues after further research and learning. (*Id.* at 172, 176-77).

The defense also called five additional witnesses to testify to Hayes's character and his interactions with R.M. Those witnesses generally stated that Hayes got along well with children, particularly R.M., and that Hayes was not a violent person. (*Id.* at 200-03, 210, 219-22, 228; ECF No. 9-9 at 12-13). After being advised of his right to testify, Hayes declined to testify. (ECF No. 9-9 at 20-21).

During jury instructions, the trial court instructed the jury that it should disregard any confession unless it found that the State had proved by a preponderance of the evidence that the confession was voluntarily made. (*Id.* at 35). Upon the jury retiring to deliberate, the defense made a motion for judgment of acquittal, which the trial court denied. (*Id.* at 114, 116). On the second day of deliberations, the jury found Hayes guilty of death of a child by parent, guardian, or custodian by child abuse. (ECF

No. 9-10 at 15). On October 28, 2011, the trial court sentenced Hayes to forty years' imprisonment and ten years' supervised released. (*Id.* at 58; ECF No. 9-1 at 13-14).

On January 9, 2012, the trial court held a hearing on Hayes's post-trial motion for judgment of acquittal, which raised multiple assignments of error. (*Id.* at 66). In particular, defense counsel argued that Hayes was entitled to acquittal because the trial court failed to enforce the defense's subpoena for Dr. Mock; the trial court prevented Dr. Young from testifying regarding Dr. Mock's credentials; the trial court failed to suppress Hayes's statement to police; the State offered no evidence regarding malice or intent; and a juror revealed post-trial that he believed R.M.'s death was an accident, but he voted guilty because Hayes was the last person with R.M. before the onset of her symptoms. (ECF No. 9-1 at 5-8). An investigator for the defense supplied an affidavit attesting to the juror's post-trial revelations. (*Id.* at 9). At the conclusion of the hearing, the trial court denied Hayes's motion. (ECF No. 9-10 at 87-88).

On November 23, 2011, Hayes filed a petition for appeal with the Supreme Court of Appeals of West Virginia ("WVSCA"). (ECF No. 9-1 at 17-25). Therein, Hayes raised twelve issues:

> 1. The jury was improperly exposed by the State to media coverage, when over Hayes's objection, the State played a recording of a certain jail call in which Hayes and his father discussed media coverage of the case;
>
> 2. The trial court denied Hayes's motion for a mistrial when the above recording was played for the jury by the State;
>
> 3. The trial court refused to enforce the subpoena served by the defense on Dr. Mock, which denied Hayes his right to call witnesses and confront his accusers;
>
> 4. The trial court refused to permit Dr. Young to testify concerning Dr. Mock's credentials and Dr. Mock's false and misleading testimony;
>
> 5. The trial court refused to exclude certain gruesome photographs objected to by the defense;

21

6. The trial court denied Hayes's motion to suppress the third statement given by Hayes, which was coerced;

7. The trial court exposed the jury to a toy car that the State argued, but did not prove, was identical to the toy on which R.M. hit her head;

8. The trial court did not give a limiting instruction after Detective Cook characterized R.M.'s scalp injuries as bruises;

9. The trial court refused to excuse for cause a juror who acknowledged a relationship with the prosecutor;

10. The trial court refused to grant Hayes a directed verdict when the State offered no evidence with regard to the elements of malice or intent;

11. The evidence was insufficient to convince a rational trier of fact that the elements of the crime were proven beyond a reasonable doubt; and

12. The jury did not follow the trial court's instructions.

(*Id.* at 24-25). Hayes subsequently perfected his appeal on July 16, 2012, limiting his appeal to two issues: (1) the trial court denied Hayes's right to compulsory process when it refused to enforce the defense's subpoena for Dr. Mock; and (2) the trial court denied Hayes's right to present a complete defense when the court prohibited Dr. Young from testifying as to how the American Board of Pathology's test-taking procedures impeached Dr. Mock's testimony. (*Id.* at 27, 31).

On May 17, 2013, the WVSCA issued a memorandum decision affirming Hayes's conviction. As to Hayes's first assignment of error, the WVSCA held that the trial court "neither denied [Hayes's] right to compulsory process nor abused its discretion when it refused to enforce [Hayes's] subpoena of Dr. Mock." (*Id.* at 55). The court reasoned that Hayes's counsel had "ample opportunity to investigate Dr. Mock's credentials prior to trial given that the State disclosed Dr. Mock ... to the defense four months before trial." (*Id.*) Moreover, the court found that Dr. Mock's direct testimony concerning his qualifications "put the defense on notice of a need to inquire on cross-

examination" related to the issue. (*Id.*) The court also pointed out that the trial court permitted defense counsel to delay cross-examination of Dr. Mock until after defense counsel could consult with Dr. Young about Dr. Mock's testimony. (*Id.*) Furthermore, the court noted that Dr. Mock was cross-examined for approximately ninety minutes, during which time Dr. Mock unequivocally stated that he had not previously taken the anatomic pathology examination. (*Id.* at 55-56). The court found Hayes's first assignment of error unconvincing for two additional reasons: (1) defense counsel failed to reserve the right to recall Dr. Mock, and (2) defense counsel "failed to vouch the record that Dr. Mock actually lied about his credentialing to conceal an academic failure." (*Id.* at 56).

Regarding Hayes's second assignment of error, the WVSCA held that "[t]he trial court did not deny [Hayes] the right to present a complete defense by prohibiting Dr. Young from *speculating*, in the presence of the jury, whether Dr. Mock *may* have failed the anatomic pathology exam." (*Id.* at 57) (emphasis in original). The court noted that Hayes had presented no evidence that Dr. Young was an expert on the American Board of Pathology's examination procedures, nor had Hayes put forth any evidence regarding the Board's testing procedures. (*Id.*) The WVSCA issued its mandate on June 17, 2013. (*Id.* at 58).

### B. State Habeas Proceedings

On April 2, 2014, Hayes filed a petition for a writ of habeas corpus in the Circuit Court for Kanawha County. (ECF No. 9-1 at 60-100). The petition raised four grounds for relief:

> 1. Counsel rendered ineffective assistance under the State and Federal Constitution by virtue of his deficient performance in protecting and litigating the denial of [Hayes's] right to be free from a coerced statement.

2. Counsel rendered ineffective assistance under the State and Federal Constitution by virtue of his deficient performance in denying [Hayes] of his defense for failing to meaningfully cross-examine the State['s] expert witness [Dr.] Mock.

3. Counsel rendered ineffective assistance under the State and Federal Constitution by virtue of his deficient performance in litigating the issue of insufficient evidence.

4. Counsel rendered ineffective assistance under the State and Federal Constitution by virtue of his failure to raise claims herein on direct appeal.

(*Id.* at 71-97). In support of his first ground for relief, Hayes attached an affidavit to his petition wherein he stated that, during the second interview with police, "[t]he detective's coercive tactics caused [his] free-will to be over-come [*sic*]," which resulted in Hayes providing an "involuntary statement." (*Id.* at 99).

On August 22, 2014, the circuit court entered an order denying Hayes's state habeas petition without appointing counsel or conducting an evidentiary hearing. (*Id.* at 127). The circuit court recognized in its written order that a court may deny a state habeas petition "without a hearing and without appointing counsel if the petition, exhibits, affidavits and other documentary evidence show to the circuit court's satisfaction that the [p]etitioner is not entitled to relief." (*Id.* at 127, 138). On Hayes's first ground for relief, the circuit court found that defense counsel "argued vigorously" at the suppression hearing that Hayes's statement to the police during his second interview was coerced. (*Id.* at 139). The court noted that Hayes's second police interview lasted two and one-half hours, during which time Hayes was never handcuffed and was given cigarette breaks. (*Id.* at 140). The court indicated that it was within the trial court's discretion to find that Hayes's statement was voluntary. (*Id.*) The court also found that Hayes could not demonstrate that prejudice resulted from

the introduction of the statement. (*Id.*) The court pointed out that Hayes did not confess in his statement to shaking or abusing R.M., and as such, the court concluded that excluding Hayes's statement would not have resulted in a different outcome at trial. (*Id.*)

With respect to Hayes's second ground for relief, the circuit court found that defense counsel thoroughly cross-examined Dr. Mock on the subject of his experience and credentials, and as such, counsel's performance was not deficient. (*Id.* at 141-42). Moreover, the circuit court found that Dr. Mock was qualified to perform autopsies pursuant to West Virginia Code § 61-12-10 because Dr. Mock testified that he completed fellowship training in forensic pathology at the New Mexico University Office of the Chief Medical Investigator. (*Id.* at 141). The court also noted that Hayes offered his own expert to explain the cause of R.M.'s death; however, the court found that the jury must have rejected Dr. Young's opinion. (*Id.* at 142). Furthermore, the court emphasized that Dr. Caceres testified that R.M. was the victim of abuse, and "there were no possible attacks on his credentials in his respective field." (*Id.*) In light of the above and the other evidence presented by the State at trial, the court found that Hayes could not demonstrate any prejudice resulting from defense counsel's failure to more meticulously cross-examine Dr. Mock. (*Id.*)

Turning to Hayes's third ground for relief, the circuit court found that "the weight of the evidence presented against [Hayes] at trial was more than sufficient to sustain his conviction." (*Id.* at 143). The court pointed out that Hayes was the only person with R.M. on September 30, 2010, after Hayes dropped M.B. off at work. (*Id.*) According to both Hayes and M.B., R.M. was in good health that morning. (*Id.*) The court highlighted Hayes's phone call to his father wherein he insisted that he did not

mean to hurt R.M. "like that." (*Id.* at 144). In addition, the court found "there was ample medical evidence that [R.M.'s] injuries were the result of abuse and that her injuries were acute to her admission to the emergency room on September 30, 2010." (*Id.*) The court asserted that "[t]he medical evidence presented by the State was compelling and credible—even when compared to the expert testimony provided by [Hayes's] expert, Dr. Young." (*Id.*)

Lastly, the circuit court rejected Hayes's ineffective assistance of appellate counsel argument. (*Id.* at 145). The court found that "the fact that [Hayes's] appellate counsel chose not to appeal the trial court's decision regarding the admission of [Hayes's] statement and trial counsel's failure to litigate sufficiency of the evidence to convict [Hayes] does not establish that his performance on appeal was deficient." (*Id.*) Separately, the court found that Hayes could not demonstrate prejudice resulting from appellate counsel's failure to raise those issues on appeal. (*Id.*)

On September 15, 2014, Hayes appealed the circuit court's denial of state habeas relief. (ECF No. 9-2 at 2-6). On appeal, Hayes raised four assignments of error:

> 1. Did the lower [c]ourt have jurisdiction to enter judgment of conviction and sentence under the indictment when said indictment failed to allege facts and circumstances constituting the offense charged.
>
> 2. Did the lower [c]ourt abuse its discretion by denying [Hayes's] Petition for Writ of Habeas Corpus without finding that trial counsel rendered ineffective assistance of counsel by:
>
> > a. Not arguing the proper standard for review on his challenge of insufficiency of the evidence when the evidence did not establish all [of] the elements of the crime....
> >
> > b. (i) Failing to have [Hayes] take the witness stand, during the hearing to suppress statement, to introduce testimonial evidence that his statement to detectives was in fact the product of coercion which resulted in [Hayes's] free will having been overborne.... (ii)

Failing to provide the trial [c]ourt with binding authority to support the claim that [Hayes's] statement was involuntary ....

c. Denying [Hayes] a complete defense by failing to conduct a reasonable investigation into [Dr. Mock's] qualifications ....

3. Did the lower [c]ourt abuse its discretion by denying [Hayes's] Petition for Writ of Habeas Corpus without finding that [d]irect [a]ppeal [c]ounsel rendered ineffective assistance of counsel by his failure to raise with the [WVSCA] the claims regarding ineffective assistance of trial counsel and jurisdiction of the trial court due to void indictment[.]

4. Did the lower [c]ourt abuse its discretion by failing to provide [Hayes] with the facilities and procedures needed to establish his entitlement to relief.

(*Id.* at 14-15). Respondent filed a response brief on April 7, 2015, which attached a 2012 Booklet of Information from the American Board of Pathology demonstrating that the anatomic pathology and clinical pathology examinations could be taken separately. (*Id.* at 52, 97).

On September 11, 2015, the WVSCA issued a memorandum decision affirming the circuit court's denial of state habeas relief. (*Id.* at 122). The WVSCA held that the circuit court's order "adequately rejected" the claims raised in Hayes's state habeas petition, and the court adopted and incorporated the circuit court's order. (*Id.* at 124-25). Accordingly, the WVSCA solely addressed the errors raised by Hayes for the first time on appeal. (*Id.* at 124). First, the WVSCA found that the indictment "closely track[ed]" the language of the charging statute, and therefore, the indictment was not defective. (*Id.*) Second, the WVSCA held that appellate counsel was not ineffective for failing to raise "meritless" claims. (*Id.*) The court noted that any claim on direct appeal regarding the indictment was destined to fail. (*Id.*) Similarly, the court observed that any ineffective assistance of trial counsel claim would have been unsuccessful on direct appeal, particularly when one considers that the WVSCA "rarely" addresses claims of

ineffective assistance of counsel on direct appeal. (*Id.*) Lastly, the WVSCA concluded

that the circuit court properly denied Hayes's state habeas petition without holding an

evidentiary hearing. (*Id.* at 125). The WVSCA issued its mandate affirming the circuit

court's decision on October 13, 2015. (*Id.* at 127).

### C. Federal Habeas Petition

On November 30, 2015, Hayes filed his § 2254 petition seeking a writ of habeas

corpus. (ECF No. 2). Therein, Hayes asserts the following grounds in support of his §

2254 habeas petition:

> 1. Hayes stands convicted and imprisoned in violation of the Fifth Amendment to the United States Constitution by the denial of his Constitutional right to be free from a coerced statement. (*Id.* at 5).
>
> 2. Trial counsel rendered ineffective assistance under the Sixth Amendment to the United States Constitution by denying Hayes his defense when counsel failed to meaningfully cross-examine Dr. Mock. (*Id.* at 9).
>
> 3. Trial counsel provided ineffective assistance under the Sixth Amendment to the United States Constitution by his deficient performance in litigating the issue of insufficient evidence. (*Id.* at 14).
>
> 4. Appellate counsel rendered ineffective assistance of counsel when he failed to raise the preceding three claims on direct appeal. (*Id.* at 16).

In support of his first ground for relief, Hayes asserts that his statement was

coerced because the detectives informed Hayes that, if he confessed that R.M.'s death

was an accident, then he would be free to leave. (*Id.* at 7). Hayes insists that "[i]f not

for the coerced statement, there would not be any evidence that an accidental incident

may have occurred." (*Id.*) With respect to his second ground for relief, Hayes argues

that trial counsel failed to investigate whether Dr. Mock was qualified under West

Virginia state law to perform an autopsy on R.M. (*Id.* at 12). According to Hayes, if trial

counsel had conducted an investigation into Dr. Mock's qualifications, a reasonable

probability exists that counsel would have discovered that Dr. Mock did not possess the requisite qualifications for performing an autopsy on R.M., a fact which could have been relayed to the jury. (*Id.*) Given the conflicting expert opinions as to R.M.'s death, Hayes contends that information related to Dr. Mock's lack of qualifications was crucial to the defense and could have led the jury to accept Dr. Young's opinion concerning the cause of R.M.'s death. (*Id.* at 13). As for Hayes's third ground for relief, he claims that defense counsel was ineffective in failing to argue the sufficiency of the evidence in Hayes's post-trial motion for judgment of acquittal. (*Id.* at 15). Hayes insists that there is a reasonable probability that counsel would have prevailed if counsel had raised such an argument. (*Id.*) Lastly, Hayes asserts that his counsel was ineffective for failing to raise the aforementioned claims on direct appeal. (*Id.* at 16).

On December 11, 2015, the undersigned ordered Respondent to answer the petition. (ECF No. 7). On February 9, 2016, Respondent filed an answer, (ECF No. 8), and a motion for summary judgment with an accompanying memorandum of law, (ECF Nos. 9 & 10). In Respondent's Answer, he asserts that Hayes has exhausted his state court remedies for the claims contained in his § 2254 petition. (ECF No. 8 at 2). In his memorandum, Respondent argues that Hayes is not entitled to federal habeas relief. (ECF No. 10). First, Respondent argues that the state court did not unreasonably apply federal law in finding that Hayes's ineffective assistance of counsel claim related to his October 4 statement was meritless. (*Id.* at 20). Respondent asserts that Hayes's trial counsel forcefully argued at the suppression hearing that the statement should not be admitted at trial. (*Id.* at 21). In addition, Respondent points out that the circuit court found that Hayes's statement was not coerced. (*Id.*) Moreover, Respondent contends that Hayes's "statement to police was of little relevance to the State's case-in-chief

29

beyond [Hayes's] outlandish and likely impossible statement of events in which he fell down the stairs while holding the minor victim." (*Id.*) Respondent emphasizes that Hayes did not admit to abusing R.M. in his statement. (*Id.*)

Second, Respondent argues that the circuit court did not unreasonably apply federal law in denying Hayes's claim that trial counsel failed to adequately cross-examine Dr. Mock. (*Id.* at 22-23). Respondent asserts that Dr. Mock was qualified to perform autopsies under West Virginia law at the time that he performed R.M.'s autopsy. (*Id.* at 22). Moreover, Respondent highlights the circuit court's finding that defense counsel "vigorous[ly]" cross-examined Dr. Mock concerning his qualifications. (*Id.*) Separately, Respondent contends that Hayes cannot demonstrate prejudice for his claim. (*Id.*) Respondent argues that Dr. Caceres offered an opinion that R.M.'s death was caused by abuse, which corroborated Dr. Mock's testimony. (*Id.*) Additionally, Respondent notes that the jury heard Dr. Young's criticisms of Dr. Mock's autopsy, but nevertheless found Hayes guilty. (*Id.*)

Third, Respondent asserts that the State introduced sufficient evidence of Hayes's guilt at trial. (*Id.* at 23). Respondent points out that R.M. was in the care of Hayes on September 30 and was in good health until left alone with Hayes that morning. (*Id.* at 23-24). Respondent stresses that Hayes later gave a statement to police that was illogical and told his father that he did not intend to hurt R.M. "like that." (*Id.* at 24). In addition, Respondent cites the testimony of the State's two expert witnesses, who both opined that R.M.'s death was the result of abuse. (*Id.*)

Lastly, Respondent insists that Hayes's fourth ground for relief is meritless. (*Id.* at 25). Respondent asserts that the aforementioned grounds for relief are frivolous, and therefore, appellate counsel was not ineffective for failing to raise those claims on

direct appeal. (*Id.*) Ultimately, Respondent maintains that all four grounds for relief in Hayes's § 2254 petition are meritless, and thus, Hayes's petition should be dismissed. (*Id.*)

On March 4, 2016, the undersigned entered an order notifying Hayes of his right to file a response to Respondent's motion for summary judgment and permitting Respondent to file a reply memorandum to any response brief tendered by Hayes. (ECF No. 13). On March 11, 2016, Hayes filed a response to Respondent's motion for summary judgment. (ECF No. 14). On the subject of his first ground for relief, Hayes argues that Respondent neglected to respond to Hayes's position that trial counsel failed to have Hayes testify at the suppression hearing and that trial counsel failed to cite authority in support of the motion to suppress; however, Hayes did not raise these issues in his § 2254 petition. (*Id.* at 5; ECF No. 2 at 5-7). Hayes insists that his statement was coerced because the detectives implicitly promised that he would be free to go if he told them that R.M.'s death was an accident. (*Id.*) Hayes contends that the State used his statement against him at trial and that the admission of the statement rendered Hayes unable to testify on his own behalf at trial for fear of impeachment. (*Id.* at 6). Hayes asserts that he would have testified at trial consistent with his initial statement to police and his statement to the Child Protective Services worker. (*Id.*) As to Hayes's second ground for relief, he argues that Dr. Mock was not qualified to perform an autopsy on R.M. pursuant to West Virginia Code § 61-12-10(a). (ECF No. 14 at 7). Hayes maintains that defense counsel's cross-examination of Dr. Mock would have been more effective if counsel had investigated and discovered before trial that Dr. Mock lacked the requisite qualifications to perform an autopsy. (*Id.*) Hayes asserts that he was prejudiced by counsel's deficient performance because further

impeachment of Dr. Mock may have led the jury to assign more weight to Dr. Young's opinion. (*Id.* at 8-10). Relatedly, Hayes contends that the state circuit court abused its discretion by failing to hold an evidentiary hearing on the issue of Dr. Mock's qualifications. (*Id.* at 8). Finally, regarding Hayes's third ground for relief, he argues that the State produced no evidence at trial that he maliciously and intentionally harmed R.M. (*Id.* at 11-13). Hayes supports his claim by citing to the defense investigator's affidavit described above, which purportedly bolsters his claim that the State failed to prove that he caused R.M.'s death and that R.M.'s death was a result of Hayes's intentional and malicious actions. (*Id.* at 12).

## II.   **Standard of Review**

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in state custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When determining the merits of a § 2254 petition, the district court applies the standard set forth in § 2254(d), which provides that the habeas petition of a person in State custody "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" is:

(1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d) (1) and (2). Moreover, the factual determinations made by the state

court are presumed to be correct and are only rebutted upon presentation of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Thus, when reviewing a petition for habeas relief, the federal court uses a "highly deferential lens." *DeCastro v. Branker,* 642 F.3d 442, 449 (4th Cir. 2011).

A claim is generally considered to have been "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and independent meanings. *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision warrants habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (quoting *Williams,* 529 U.S. at 405) (internal quotations omitted). A habeas writ may be granted under the "unreasonable application" clause if the state court "identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular case." *Id.* at 300-01 (internal marks omitted).

Accordingly, the AEDPA limits the habeas court's scope of review to the reasonableness, rather than the correctness, of the state court's decision. A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather the application must also be unreasonable." *Williams*, 529 U.S. at 365.

Here, Respondent has moved for summary judgment. (ECF No. 9). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." Charles Alan Wright, Arthur R. Miller &, Mary Kay Kane, *Federal Practice and Procedure*: *Civil* § 2725 (3d ed. 2005). On the other hand, a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). In addition, only genuine disputes over material facts "will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Motions for summary judgment impose a heavy burden on the moving party as

it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990). Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50).

## III. Discussion

### A. Whether Hayes's Statements to the Police During the Second Police Interview were Coerced

In his first ground for relief, Hayes contends that he "stands convicted and imprisoned in violation of the Fifth Amendment to the United States Constitution by the denial of his Constitutional right to be free from a coerced statement." (ECF No. 2 at 5). Specifically, Hayes argues that the trial court erred by admitting his statements from his October 4, 2010 interview with police. (*Id.* at 5-7). Hayes insists that the detectives implicitly promised that he would be free to leave if he admitted that R.M.'s death was an accident. (*Id.* at 7).

Respondent does not raise a lack of exhaustion, even though Hayes primarily argued this issue in state court under the guise of ineffective assistance of counsel. Nevertheless, the undersigned **FINDS** that Hayes exhausted his state court remedies by fairly presenting the underlying federal claim, i.e. the voluntariness of his

statements, to the state courts.[4] *See Ramdass v. Angelone*, 187 F.3d 396, 409 (4th Cir. 1999) (holding that petitioner's claim regarding due process right to mental health expert was exhausted where petitioner argued in state court that counsel was ineffective for failing to secure mental health expert and cited federal standard for appointing mental health expert). Moreover, the state circuit court partially based its decision denying Hayes's claim on a finding that the trial court properly exercised its discretion in admitting Hayes's statements. Therefore, exhaustion is accepted, and AEDPA deference is applied to the state court's decision denying the claim.

In his state habeas petition, Hayes asserted that his trial counsel was ineffective in litigating the admissibility of his October 4 statements because counsel failed to have Hayes testify at the suppression hearing and neglected to provide any authority to the trial court supporting his arguments for suppression. (ECF No. 9-1 at 86-87). However, in the memorandum in support of his petition, Hayes not only cited the standard for ineffective assistance of counsel, but also the Supreme Court's decision in *Hutto v. Ross*, 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976), which describes the standard for the admissibility of a confession under federal law. (ECF No. 9-1 at 86). After noting the proper inquiry under *Hutto*, Hayes argued that the State could not meet its burden in demonstrating that his statements to the police were voluntary. (*Id.* at 87).

The state circuit court denied Hayes's claim, finding that defense counsel "argued vigorously over the course of [the] suppression hearing ... that [Hayes's] statement was coerced." (*Id.* at 139). Yet, the circuit court's discussion of the issue did

---

[4] To the extent that this claim may be unexhausted or exhausted and procedurally defaulted, it may still be dismissed on the merits for the reasons set forth below. 28 U.S.C. § 2254(b)(2); *see Smith v. Mirandy*, No. 2:14-cv-18928, 2016 WL 1274592, at *17 (S.D.W.Va. Mar. 31, 2016).

not end there. The circuit court noted the standard for determining the voluntariness of a confession explicated in *State v. Bradshaw*, 457 S.E.2d 456 (W. Va. 1995). (ECF No. 9-1 at 139). In *Bradshaw*, the WVSCA looked to both United States Supreme Court precedent and WVSCA precedent when describing the test for admitting "extrajudicial inculpatory statements." 457 S.E.2d at 464 (citing, *inter alia*, *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)). Applying the *Bradshaw* standard, the circuit court concluded that the trial court "was clearly within its discretion to find that [Hayes's] statement was voluntary." (ECF No. 9-1 at 140). On appeal to the WVSCA, Hayes again cited and argued the federal standard for the admissibility of a confession under federal law. (ECF No. 9-2 at 38) (citing *Lego*, 404 U.S. at 489). The WVSCA adopted the circuit court's findings and conclusions on the issue. (*Id.* at 124-25).

"[T]he Fourteenth Amendment is grievously breached when an involuntary confession is obtained by state officers and introduced into evidence in a criminal prosecution which culminates in a conviction." *Blackburn v. Alabama*, 361 U.S. 199, 205, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). "The test for determining whether a statement is voluntary under the Due Process Clause is whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (quoting *Hutto*, 429 U.S. at 30) (markings omitted). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary. The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired." *Id.* (quoting *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987)) (markings omitted); *see also United States v. Umana*, 750

F.3d 320, 344-45 (4th Cir. 2014) (same); *Rose v. Lee*, 252 F.3d 676, 685 (4th Cir. 2001) ("[T]he existence of a promise in connection with a confession does not render a confession per se involuntary."). "To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Braxton*, 112 F.3d at 781 (quoting *Pelton*, 835 F.2d at 1071) (markings omitted). "Any statement given freely and voluntarily without any compelling influences is admissible in evidence." *Id.* Admissibility of a confession at trial depends on "the prosecution [proving] at least by a preponderance of the evidence that the confession was voluntary."[5] *Lego*, 404 U.S. at 489.

Hayes maintains his confession was involuntary because the interviewing detectives implicitly promised that Hayes would be free to leave if he admitted that he had a role in R.M.'s death, but her death was purely accidental. (ECF No. 2 at 7). However, it does not appear that the detectives explicitly promised Hayes anything in exchange for an inculpatory statement. Although Detective Cook equivocally informed Hayes, "If it was a hundred percent an accident, [Hayes] would *probably* be free to leave once it's dealt with," other federal courts have determined that similar interrogation tactics do not automatically render a confession involuntary. *See Ramirez v. Montgomery*, No. 12-1472, 2014 WL 333556, at *15-*18 (C.D. Cal. Jan. 29,

---

[5] Even then, in some jurisdictions, admission of the confession is not the end of the query. For instance, in West Virginia, "[a] jury can consider the voluntariness of the confession, and [the WVSCA] approve[s] of an instruction telling the jury to disregard the confession unless it finds that the State has proved by a preponderance of the evidence it was made voluntarily." Syl. Pt. 4, *State v. Vance*, 250 S.E.2d 146, 148 (W. Va. 1978). Indeed, such a jury instruction was given in Hayes's case.

2014) (finding that state court's determination that petitioner's confession was voluntary was not unreasonable where officers contrasted consequences of "purposeful shooting" with those of "some type of accident"); *United States v. Hunter*, 912 F. Supp. 2d 388, 400-01 (E.D. Va. 2012) (finding that defendant's confession to shaking baby was voluntary where interviewing officer repeatedly assured defendant that no one would fault defendant and that baby's death was accident); *Adams v. Hornbeak*, No. 1:10-cv-02110, 2011 WL 2946281, at *17 (E.D. Cal. July 21, 2011) (finding that confession was voluntary where polygraph examiner told petitioner that case would "remain a homicide" unless petitioner explained that death of victim was accident); *cf. United States v. Lopez*, 437 F.3d 1059, 1064-65 (10th Cir. 2006) (holding district court did not clearly err in finding that agent's use of pieces of paper during interrogation labeled "murder" and "mistake" along with "60" years and "6" years was promise of leniency because agent conveyed that admitting killing was "mistake" would carry much lesser sentence and holding that this tactic was coercive).

Likewise, the Fourth Circuit has "consistently declined to hold categorically that a suspect's statements are involuntary simply because police deceptively highlight the positive aspects of confession." *Umana*, 750 F.3d at 344. Nor are a suspect's statements involuntary because an officer admonishes the suspect "to tell the truth or face consequences." *United States v. Tisdale*, 80 F. App'x 843, 844 (4th Cir. 2003). Here, the interviewing detectives certainly emphasized the positive aspects of Hayes providing a statement describing R.M.'s death as accidental; however, the detectives never unambiguously promised that Hayes would receive a lesser sentence or would not be criminally charged for R.M.'s death. Moreover, the detectives consistently encouraged Hayes to tell the truth, and Detective Cook informed Hayes that it was

"more than likely" that Hayes would be leaving the police station in handcuffs that day given R.M.'s injuries. Viewing the detectives' statements about an accident in the context of the entire interview, Hayes could not have sensibly understood the officers to have promised him freedom in exchange for a confession.

Additionally, "a law enforcement officer may properly tell the truth to the accused." *United States v. Holmes*, 670 F.3d 586, 592 (4th Cir. 2012). "[S]tatements by law enforcement officers that are merely 'uncomfortable' or create a 'predicament' for a defendant are not ipso facto coercive." *Id.* a 592-93 (quoting *Pelton*, 835 F.2d at 1072-73). Here, the detectives informed Hayes that he might be free to leave if R.M.'s death were confirmed to be a complete accident, which was probably true. Although this may have created a predicament for Hayes by encouraging him to construct an accident narrative, that alone is not coercive.

Furthermore, assessing the totality of the circumstances, there is no indication that the location or the length of the questioning, or Hayes's personal characteristics made him particularly susceptible to the aforementioned tactics overbearing his will and causing him to provide a damaging statement. The second police interview took place in the kitchen area of the South Charleston Police Department and lasted approximately two and one-half hours, during which time Hayes was never handcuffed and was given breaks. (ECF No. 9-1 at 140). Before the interview began, Hayes was read his *Miranda* rights and also informed that he was not under arrest and that he was free to leave at any time. (ECF No. 9-2 at 130-31). After confirming that he could read, Hayes signed a written waiver of these rights. (*Id.*) Detective Paschall testified at the suppression hearing that Hayes appeared to be "of sound mind and body" before the interview. At one point during the interview, Hayes remarked that he was "not

40

uneducated." (*Id.* at 155). Hayes's responses demonstrate that he could understand and intelligently answer the detectives' questions. *See United States v. Ayesh*, 702 F.3d 162, 169 (4th Cir. 2012) (affirming district court's finding that defendant's statements to police were freely and voluntarily given where defendant was intelligent, signed form indicating that he understood and wished to waive *Miranda* rights, and "spoke confidently on his own behalf"). Although Hayes may have been emotionally vulnerable the day after learning of R.M.'s death, that factor is not dispositive in the voluntariness analysis.

The AEDPA limits the Court's review to whether the state court's denial of Hayes's involuntary confession claim was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). Notwithstanding the recognition that Hayes may have been emotionally liable at the time of the second police interview and that some of the detectives' specific questions could be interpreted as inducing, the undersigned **FINDS** that state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the undersigned **RECOMMENDS** that Hayes's first ground for relief be **DENIED**, and Respondent be **GRANTED** summary judgment on ground one of Hayes's § 2254 petition.[6]

## B. Ineffective Assistance of Counsel

In his next three grounds for relief, Hayes argues that his trial counsel and

---

[6] Insofar as Hayes contends in his response memorandum that trial counsel was ineffective in arguing the voluntariness of his statements, his contention is without merit. As the state court found, trial counsel argued vehemently at both the suppression hearing and during trial that Hayes's statements to police were coerced. The state circuit court's determination that Hayes's trial counsel did not perform deficiently in arguing this issue, which was adopted by the WVSCA, is not contrary to, or an unreasonable application of, clearly established federal law. (ECF No. 9-1 at 139-40; ECF No. 9-2 at 124-25).

appellate counsel were ineffective. The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the right to the effective assistance of counsel." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate ... defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 687-88, 694. When reviewing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 690. Moreover, counsel's performance should be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and a court should not allow hindsight to alter its review. *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In addition, trial strategy devised after investigating the law and facts is "virtually unchallengeable." *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995).

In a § 2254 proceeding, the standard of review differs somewhat from the standard used in the direct review of a *Strickland*-based challenge where the state court adjudicated the petitioner's ineffective assistance of counsel claims on the merits. *Harrington v. Richter*, 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when

the two apply in tandem review is doubly so." *Id.* at 105 (internal citations and quotations omitted). "'Surmounting *Strickland's* high bar is never an easy task[;]' ... Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* (quoting *Padilla v. Kentucky,* 559 U.S. 356, 371, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010)). When a state court has adjudicated an ineffective assistance of counsel claim on the merits in summary fashion, the issue is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

### 1. Trial Counsel's Cross-Examination of Dr. Mock

In his second ground for relief, Hayes contends that trial counsel was ineffective for failing to meaningfully cross-examine Dr. Mock. (ECF No. 2 at 9). Hayes insists that counsel should have conducted an investigation into Dr. Mock's credentials prior to trial, which he asserts would have revealed that Dr. Mock was not qualified to perform R.M.'s autopsy under West Virginia Code § 61-12-10(a). (ECF No. 2 at 12; ECF No. 14 at 7-8). Hayes argues that his counsel could have confronted Dr. Mock on cross-examination with his lack of qualification to perform autopsies under state law. (ECF No. 2 at 12). Had counsel done so, Hayes asserts that the jury may have chosen to assign more weight to Dr. Young's opinions concerning the cause of R.M.'s injuries. (*Id.* at 13).

The state circuit court rejected Hayes's claim and found that trial counsel had "vigorously cross-examined Dr. Mock regarding his experience and credentials." (ECF No. 9-1 at 142). The court also emphasized that trial counsel presented an expert to refute Dr. Mock's opinions. (*Id.*) Consequently, the state circuit court found that trial counsel did not perform deficiently. Separately, the circuit court found that Hayes

could not establish prejudice for his claim. The court found that Dr. Mock was qualified to conduct R.M.'s autopsy because he testified that he had completed a fellowship in forensic pathology. (*Id.* at 141). The court also emphasized Dr. Caceres's testimony that R.M. was the victim of abuse, which caused her injuries. (*Id.* at 142). The circuit court concluded that, "[g]iven the weight of the evidence the State presented at trial," additional questioning of Dr. Mock concerning his credentials would not have altered the outcome of Hayes's trial. (*Id.*) The WVSCA adopted the circuit court's findings and conclusions. (ECF No. 9-2 at 124-25).

"Defense counsel's determinations concerning witness examination fall within the ambit of trial strategy that federal habeas courts are not inclined to second-guess." *Williams v. Bishop*, No. 13-3755, 2015 WL 4984396, at *8 (D. Md. Aug. 18, 2015) (citing *United States v. Terry,* 366 F.3d 312, 317 (4th Cir. 2004)). "Decisions about questioning witnesses require the balancing of risks and benefits and therefore warrant 'enormous deference' from reviewing courts." *Id.* (quoting *Terry*, 366 F.3d at 317). The state court's determination that defense counsel thoroughly cross-examined Dr. Mock is supported by the record. Before questioning Dr. Mock, defense counsel consulted with Dr. Young in preparation. (ECF No. 9-5 at 255). According to the WVSCA, defense counsel's cross-examination of Dr. Mock lasted approximately ninety minutes. (ECF No. 9-1 at 55). During that time, defense counsel extensively questioned Dr. Mock about his qualifications, findings, and opinions. Defense counsel also zealously questioned Dr. Mock on the crucial issue of whether R.M.'s skull fracture was a healing fracture.

Furthermore, defense counsel did not perform deficiently in failing to investigate and subsequently question whether Dr. Mock was qualified to perform

autopsies under West Virginia law. West Virginia Code § 61-12-10(a) provides:

> If in the opinion of the chief medical examiner, or of the county medical examiner of the county in which the death in question occurred, it is advisable and in the public interest that an autopsy be made, or if an autopsy is requested by either the prosecuting attorney or the judge of the circuit court or other court of record having criminal jurisdiction in that county, an autopsy shall be conducted by the chief medical examiner or his or her designee, by a member of his or her staff, or by a competent pathologist designated and employed by the chief medical examiner under the provisions of this article. For this purpose, the chief medical examiner may employ any county medical examiner who is a pathologist who holds board certification or board eligibility in forensic pathology or has completed an American Board of Pathology fellowship in forensic pathology to make the autopsies ....

West Virginia Code § 61-12-10(a) permits autopsies to be performed by "a competent pathologist designated and employed by the chief medical examiner under the provisions of this article." Looking to another provision of Article 61, West Virginia Code § 61-12-6 states, "the chief medical examiner may, in order to provide for the investigation of the cause of death as authorized in this article, employ and pay qualified pathologists and toxicologists to make autopsies .... Qualified pathologists shall hold board certification or board eligibility in forensic pathology or have completed an American board of pathology fellowship in forensic pathology."

As the circuit court found, Dr. Mock indicated that he completed a fellowship in forensic pathology at the New Mexico University Office of the Chief Medical Examiner. (ECF No. 9-1 at 141). The circuit court also pointed out that Dr. Mock's curriculum vitae stated the same. (*Id.*) Although the circuit court's findings and Dr. Mock's testimony do not specify whether the fellowship completed by Dr. Mock was an American Board of Pathology fellowship, Hayes has not offered any evidence that Dr. Mock's fellowship was not an American Board of Pathology fellowship. Accordingly, Hayes has failed to rebut the state court's finding that Dr. Mock was qualified to perform R.M.'s autopsy.

*See* 28 U.S.C. § 2254(e)(1). Given that Dr. Mock was qualified to perform R.M.'s autopsy under West Virginia state law, defense counsel was not ineffective for refraining from questioning Dr. Mock on that particular issue.

For that same reason, Hayes cannot demonstrate prejudice. There is no reasonable probability that the result of the proceeding would have been different had defense counsel questioned Dr. Mock on the issue. In fact, Dr. Mock would have almost certainly responded that he was qualified under state law, which might have bolstered his credibility. Moreover, given the evidence introduced by the State at trial, no reasonable probability exists that additional cross-examination on the issue of Dr. Mock's qualifications would have resulted in a different outcome. Indeed, Dr. Mock's findings were cosigned by Dr. Kaplan, the Chief Medical Examiner, and Dr. Caceres's opinions supported much of Dr. Mock's testimony. Lastly, the jury heard testimony from the defense's well-qualified expert, Dr. Young, critical of Dr. Mock's techniques and opinions, but the jury nevertheless found Hayes guilty. It is unlikely that further inquiry into Dr. Mock's qualifications would have altered the jury's rejection of Dr. Young's opinions.

Because a reasonable argument exists that defense counsel satisfied *Strickland*'s deferential standard, *Richter*, 562 U.S. at 105, and Hayes cannot demonstrate prejudice from any alleged error by defense counsel in cross-examining Dr. Mock, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the undersigned **RECOMMENDS** that Hayes's second ground for relief be **DENIED**, and Respondent be **GRANTED** summary judgment on ground two of Hayes's § 2254 petition.

### 2. Trial Counsel's Performance in Litigating the Issue of Insufficient Evidence in Hayes's Post-Trial Motion for Judgment of Acquittal

In his third ground for relief, Hayes argues that his trial counsel "rendered ineffective assistance under the Sixth Amendment to the United States Constitution by his deficient performance in litigating the issue of insufficient evidence." (ECF No. 2 at 14). Hayes asserts his counsel failed to argue in the post-trial motion for acquittal that the evidence introduced at trial was insufficient to support the jury's verdict; instead, Hayes claims that his counsel argued for acquittal by erroneously attempting to impeach the jury's verdict using a juror's affidavit. (*Id.* at 14-15). The state circuit court denied the claim because there was "more than ample evidence presented in [Hayes's] case to convict [him]." (ECF No. 9-1 at 143). In addressing Hayes's contention, the state court applied the WVSCA's holding in *State v. Guthrie*, 461 S.E.2d 163, 173 (W. Va. 1995), which adopted the standard for reviewing sufficiency of the evidence claims announced in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). (ECF No. 9-1 at 143). The WVSCA adopted the circuit court's findings and conclusion on the issue. (ECF No. 9-2 at 124-25).

To begin, the undersigned notes that Hayes's trial counsel *did* argue in Hayes's post-trial motion for judgment of acquittal that the State failed to present any evidence regarding the elements of malice and intent. (ECF No. 9-1 at 7). Trial counsel also argued the issue at the hearing on the motion. (ECF No. 9-10 at 72-73). Thus, to the extent that Hayes asserts that trial counsel neglected to raise the issue, his assertion is belied by the state court record. Accordingly, Hayes cannot demonstrate that counsel's performance was deficient because counsel raised and adequately argued the sufficiency of the evidence in Hayes's post-trial motion for acquittal.

Moreover, as the state court found, Hayes cannot establish that he was prejudiced by any inadequacy in trial counsel's presentation of the issue because there was sufficient evidence for a reasonable jury to convict Hayes of violating West Virginia Code § 61-8D-2a, which provides:

> If any parent, guardian or custodian shall maliciously and intentionally inflict upon a child under his or her care, custody or control substantial physical pain, illness or any impairment of physical condition by other than accidental means, thereby causing the death of such child, then such parent, guardian or custodian shall be guilty of a felony.

In rejecting Hayes's contention, the state court applied the *Jackson* standard. In *Jackson*, the Supreme Court held that "the Due Process Clause of the Fourteenth Amendment protects a defendant in a [state] criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson*, 443 U.S. at 315 (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). In considering the issue, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. "[U]nder the AEDPA ... [federal courts] inquire whether a state court determination that the evidence was sufficient to support a conviction was an objectively unreasonable application of [the standard enunciated in] *Jackson*." *Williams v. Ozmint*, 494 F.3d 478, 489 (4th Cir. 2007) (internal citations and quotations omitted).

Having extensively reviewed the state court record, the undersigned **FINDS** that the state court's determination that Hayes could not demonstrate prejudice for his claim was reasonable. M.B. testified that, immediately prior to September 30, R.M. did not exhibit any signs of head trauma. Moreover, M.B. indicated that R.M. was happy

on the morning of September 30, and Hayes confirmed in his statements to police that R.M. was acting normal that morning. Hayes was then alone with R.M. until he arrived at IHOP that afternoon with an unresponsive R.M. in the backseat of his car. Eventually, R.M. was transported to the Women and Children's Hospital where Dr. Caceres treated her. Dr. Caceres testified that R.M.'s injuries included a "pretty large" bruise on the right side of her head extending to the front of her head, generalized brain swelling, herniation of the cerebellum, small bilateral subdural hemorrhages, bilateral retinal hemorrhaging, and a "very big" skull fracture. Dr. Caceres opined that R.M.'s injuries were non-accidental and that R.M.'s condition was consistent with shaken baby or shaken impact syndrome. He rejected the notion that R.M.'s injuries could have been caused by the September 24 incident or the fall described by Hayes on October 4. Indeed, Dr. Caceres concluded that the head trauma that R.M. suffered must have occurred within two hours of her experiencing cardiac arrest.

At R.M.'s autopsy, Dr. Mock documented subscalpular hemorrhages, subgaleal hemorrhages, acute subdural and subarachnoid hemorrhages, severe brain swelling, bleeding in the optic nerve sheath, retinal hemorrhaging in both eyes, and a five and one-quarter inch skull fracture near the middle of R.M.'s skull. Both Dr. Mock and Dr. Caceres testified that R.M.'s skull fracture was consistent with head trauma involving significant or severe force, which might be seen in a car crash, for example. Similar to Dr. Caceres, Dr. Mock opined that neither the September 24 incident nor the September 30 fall described by Hayes could have caused R.M's injuries. Dr. Mock also testified that iron stain test results indicated that R.M.'s injuries occurred in close proximity to her hospital admission. Given his findings, Dr. Mock determined that R.M.'s death was a homicide and that the cause of R.M.'s death was blunt force injuries

to her head. Dr. Mock's autopsy report containing these conclusions was cosigned by Dr. Kaplan.

In addition, other evidence tended to demonstrate Hayes's guilt. For example, Hayes lied to the police, either in telling the detectives that the day was normal or that he tripped down the stairs while holding R.M. (or both). As the circuit court pointed out, Hayes also told the detectives that he first noticed R.M. slumped over when he was "just yards" from the turn into the shopping complex where IHOP is located, yet, Hayes also stated that R.M. had already turned blue (presumably from a lack of oxygen) by the time the two arrived at IHOP. (ECF No. 9-1 at 143-44). Moreover, Hayes never called 911 or took R.M. to the hospital on September 30, which is damning in that, if R.M.'s injuries were accidental, then one would expect Hayes to have sought emergency aid. Finally, and significantly, after his arrest, Hayes called his father and told him that he "didn't mean to hurt her like that."

Viewing the evidence in the light most favorable to the State, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Insofar as Hayes argues that the State failed to introduce any evidence of malice or intent, the extent of R.M.'s injuries found by Dr. Caceres and Dr. Mock permits a reasonable juror to infer that Hayes maliciously and intentionally inflicted physical harm on R.M. *Moceri v. Stovall*, No. 2:06-CV-15009, 2008 WL 4822063, at *15 (E.D. Mich. Nov. 4, 2008) (rejecting sufficiency of evidence claim in first-degree child abuse case where intent to injure child could be inferred from nature and extent of child's injuries). Moreover, both Dr. Caceres and Dr. Mock testified that the skull fracture suffered by R.M. would typically result from the application of significant force and that R.M.'s death was not the result of an accident. *See Sivo v.*

*Wall*, 644 F.3d 46, 50-51 (1st Cir. 2011) (rejecting sufficiency of evidence claim in first-degree child abuse case where petitioner was only person with child before child's death and two treating physicians testified that child's subdural hematoma could have only been caused by "an extremely powerful blow"); *Perodin v. Miller*, No. 11-4172, 2013 WL 5818565, at *6 (C.D. Cal. Oct. 29, 2013) ("The doctors' testimony that the application of great force was required to cause the child's injury and that the injury was not accidently caused allowed the jury to deduce that the injury was intentionally caused.") (quoting *People v. Mills*, 2 Cal. Rptr. 2d 614, 629 (Cal. Ct. App. 1991)) (markings omitted). Turning to the remaining elements of the crime, sufficient evidence exists that Hayes was R.M.'s custodian at the time that R.M. suffered her injuries and that the physical injuries sustained by R.M. caused her death.

Ultimately, Hayes cannot demonstrate that his trial counsel acted unreasonably in arguing the sufficiency of the evidence during post-trial proceedings or that prejudice resulted from any error by trial counsel. Of course, it follows that a reasonable argument exists that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105. Accordingly, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the undersigned **RECOMMENDS** that Hayes's third ground for relief be **DENIED**, and Respondent be **GRANTED** summary judgment on ground three of Hayes's § 2254 petition.

### 3. Ineffective Assistance of Appellate Counsel

Lastly, in his fourth ground for relief, Hayes argues that his counsel was ineffective for failing to raise the three issues discussed above on direct appeal to the WVSCA. (ECF No. 2 at 16). In his state habeas petition, Hayes asserted that his

appellate counsel was ineffective for neglecting to raise three claims of ineffective assistance of *trial* counsel on direct appeal: (1) trial counsel failed to adequately argue for suppression of Hayes's statement; (2) trial counsel failed to meaningfully cross-examine Dr. Mock; and (3) trial counsel performed deficiently when arguing the sufficiency of the evidence in Hayes's post-trial motion for judgment of acquittal. (ECF No. 9-1 at 66, 96). The state circuit court denied Hayes's ineffective assistance of appellate counsel claim. First, the circuit court noted that Hayes's "memorandum [was] not clear as to what issues he believe[d] appellate counsel should have raised on appeal, but it [could] be assumed that [Hayes was] referring to the claims for relief raised in his [state] habeas corpus petition." (*Id.* at 144). The circuit court generally found that Hayes could not "meet the heavy burden imposed on him in establishing ineffective assistance of appellate counsel." (*Id.*) The circuit court went on to explicitly address two claims of ineffective assistance of appellate counsel: (1) appellate counsel's decision to refrain from appealing the admission of Hayes's statement to the police, and (2) appellate counsel's decision not to appeal trial counsel's purported shortcomings in litigating the sufficiency of the evidence. (*Id.* at 145). The circuit court found that Hayes could not establish either prong of the *Strickland* test on these two issues because appellate counsel was not required to present frivolous issues on direct appeal. (*Id.*)

On appeal from the circuit court's decision, Hayes argued that appellate counsel was ineffective for failing to raise on direct appeal the issues of ineffective assistance of trial counsel and the adequacy of the indictment. (ECF No. 9-2 at 45-46). The WVSCA's memorandum decision recognized that Hayes's habeas appeal raised the issue of appellate counsel's ineffectiveness. (*Id.* at 124). The WVSCA noted that Hayes argued

his appellate counsel was ineffective for failing to raise claims of ineffective assistance of trial counsel on direct appeal, including a claim related to Dr. Mock's qualifications. The WVSCA denied Hayes's ineffective assistance of appellate counsel claim, concluding that appellate counsel "had no obligation to raise meritless claims" and that any claims of ineffective assistance of trial counsel raised would not have been addressed on direct appeal. (*Id.* at 124). The WVSCA also adopted the findings and conclusions of the circuit court. (*Id.* at 124-25).

Taking the circuit court's and the WVSCA's decisions together, the undersigned **FINDS** that Hayes exhausted his state court remedies for his ineffective assistance of appellate counsel claim contained in his § 2254 petition. The state circuit court addressed Hayes's claim that appellate counsel was ineffective for failing to argue the voluntariness of his statements to police. In addition, the WVSCA resolved Hayes's contentions that appellate counsel was ineffective for failing to argue the ineffectiveness of trial counsel, including the adequacy of counsel's cross-examination of Dr. Mock and trial counsel's arguments regarding the sufficiency of the evidence. Accordingly, Hayes has exhausted his claim of ineffective assistance of appellate counsel, and the undersigned applies AEDPA deference to the state court's decision denying the claim.

A criminal defendant enjoys a right to effective assistance of counsel on direct appeal. *See Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). "Claims of ineffective assistance of appellate counsel are examined under the same *Strickland* standards applicable to claims of ineffective assistance of trial counsel." *Shrader v. United States*, No. 1:09-cr-27, 2016 WL 299036, at *4 (S.D.W.Va. Jan. 25, 2016). "In deciding which issues to raise on appeal, [counsel] is entitled to a

presumption that he decided which issues were most likely to afford relief on appeal." *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993). Importantly, appellate counsel is not ineffective for refraining from raising every nonfrivolous issue identified by a defendant on direct appeal. *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Indeed, "sometimes [arguing] a weaker non-frivolous issue would have the effect of diluting stronger arguments on appeal." *Moultrie v. United States*, 147 F. Supp. 2d 405, 409 (D.S.C. 2001). Certainly then, counsel does not render deficient performance in declining to raise issues on appeal that are destined to fail. *See, e.g.*, *Bumpass v. United States*, No. 1:14CV1036, 2015 WL 5712490, at *2 (M.D.N.C. Sept. 29, 2015); *Van Wart v. United States*, No. 12-0912, 2013 WL 3788535, at *9 (E.D. Va. July 18, 2013); *Robinson v. United States*, No. 5:09-1324, 2012 WL 5472299, at *5 (S.D.W.Va. July 20, 2012), *report and recommendation adopted by* 2012 WL 5469159 (S.D.W.Va. Nov. 9, 2012); *Moultrie*, 147 F. Supp. 2d at 409.

Because the underlying claims that form the bases of Hayes's ineffective assistance of appellate counsel are meritless, the undersigned **FINDS** that Hayes's ineffective assistance of appellate counsel claim must fail. Hayes's appellate counsel did not perform deficiently in declining to raise issues on appeal that would not have garnered relief. Moreover, with respect to Hayes's claims of ineffective assistance of trial counsel, the WVSCA rarely addresses claims of ineffective assistance of trial counsel on direct appeal. *State v. Frye*, 650 S.E.2d 574, 576 (W. Va. 2006). As such, appellate counsel acted reasonably in declining to raise those claims on direct appeal.

For the same reasons, Hayes has failed to demonstrate that he was prejudiced by any error committed by his appellate counsel. Since the claims that Hayes wishes his appellate counsel would have raised are meritless or rarely recognized by the

WVSCA on direct appeal, Hayes cannot establish that there is a reasonable probability that a different result would have occurred on direct appeal had his appellate counsel raised those claims. Therefore, the undersigned **FINDS** that the state court's decision denying Hayes's ineffective assistance of appellate counsel claim was not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the undersigned **RECOMMENDS** that Hayes's fourth ground for relief be **DENIED**, and Respondent be **GRANTED** summary judgment on ground four of Hayes's § 2254 petition.

## IV.    <u>Proposal and Recommendations</u>

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** as follows**:**

1.  Respondent's Motion for Summary Judgment, (ECF No. 9), be **GRANTED**;

2.  Petitioner's Petition for a Writ of Habeas Corpus by a Person in State Custody, (ECF No. 2), be **DENIED**; and

3.  That this action be **DISMISSED, with prejudice**, and removed from the docket of the court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Petitioner shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding

District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Petitioner, Respondent, and any counsel of record.

**FILED:** May 19, 2016

Cheryl A. Eifert
United States Magistrate Judge