# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

LARRY HAYES,

                Petitioner,

v.                                CIVIL ACTION NO.   2:15-cv-15636

MARVIN PLUMLEY,

                Respondent.

### MEMORANDUM OPINION AND ORDER

Pending before the Court are Petitioner Larry Hayes' 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus ("the § 2254 Petition") (ECF No. 2) and Respondent Marvin Plumley's Motion for Summary Judgment (ECF No. 9).   This matter was referred to United States Magistrate Judge Cheryl A. Eifert for submission of proposed findings and a recommendation for disposition ("PF&R").   On May 19, 2016, Magistrate Judge Eifert submitted a PF&R (ECF No. 15) recommending the Court grant Respondent's motion for summary judgment and dismiss the § 2254 Petition.   Petitioner filed objections to the PF&R on June 7, 2016 (ECF No. 16), which the Court will treat as timely.   For the reasons that follow, the Court **OVERRULES** Petitioner's objections, **ADOPTS** the PF&R save for the exceptions noted in this Memorandum Opinion, **GRANTS** the Motion for Summary Judgment, and **DISMISSES** the § 2254 Petition.

## I.    BACKGROUND

This case involves a collateral attack by a state prisoner on his conviction pursuant to 28 U.S.C. § 2254.   On August 29, 2011, Petitioner was convicted upon jury verdict of death of a child by a parent, guardian, or custodian.   *See* W. Va. Code § 61-8D-2a; (ECF No. 9-10 at 15–18).   The criminal charge stemmed from the death of R.M., an eighteen-month-old child who fractured her skull while allegedly in Petitioner's exclusive care and died days later from her injuries.   Following the verdict, the trial court imposed a sentence of forty years' imprisonment—the maximum penalty allowed by state law—followed by a ten-year term of supervised release. (*Id.* at 57–59.)

A summary of the evidence presented at Petitioner's jury trial, as well as the factual and procedural history of his direct appeal and collateral challenge in state court, are set forth in detail in the PF&R and need not be repeated here.   The § 2254 Petition sets forth four grounds of relief. Ground One alleges a violation of Petitioner's due process right to be free from a coerced confession.   The remaining three grounds allege ineffective assistance of counsel arising from trial counsel's failure to properly cross-examine the pathologist who conducted the victim's autopsy (Ground Two), failure to litigate the issue of insufficient evidence (Ground Three), and failure to raise the preceding claims on direct appeal (Ground Four).   After a review of the record and Petitioner's legal arguments, the magistrate judge recommended that this Court grant Respondent's motion for summary judgment (ECF No. 9) and dismiss this matter from the Court's docket.   In his objections, Petitioner raises anew his arguments with respect to Grounds One, Two, and Three of the § 2254 Petition.

## II.   LEGAL STANDARDS

### A.   Review of Magistrate Judge's Findings and Recommendation

Pursuant to Rule 72(b)(3) of the Federal Rules of Civil Procedure, the Court must determine *de novo* any part of a magistrate judge's disposition to which a proper objection has been made.   The Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed.   *Thomas v. Arn*, 474 U.S. 140, 150 (1985).   Failure to file timely objections constitutes a waiver of *de novo* review and the Petitioner's right to appeal this Court's Order.   28 U.S.C. § 636(b)(1); *see also Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).   In addition, this Court need not conduct a *de novo* review when a party "makes general and conclusory objections that do not direct the Court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).

### B.   Section 2254 Standard of Review

A federal court may grant habeas relief for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a).   Section 2254(d), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides for a deferential standard of review to be applied to any claim that was "adjudicated on the merits" in state court proceedings.   In such a case, a federal court may grant habeas relief only if the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

3

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d)(1) describes the standard of review to be applied to claims challenging how the state courts applied federal law. "A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.* The latter inquiry focuses on whether the state court's application of clearly established federal law was "unreasonable," as distinguished from whether it was "correct." *See Renico v. Lett*, 559 U.S. 766, 773 (2010); *Bell*, 535 U.S. at 694; *Williams v. Taylor*, 529 U.S. 362, 410 (2000). Moreover, the factual determinations made by the state court are "presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A habeas claim has been "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999) (citation omitted). "The phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." *Thomas v. Taylor*, 170 F.3d 466, 475 (4th Cir. 1999); *see also Harrington v. Richter*, 562 U.S. 86, 98 (2011) (section 2254(d) applies even if the state court issued a summary decision unaccompanied by an explanation).

4

C.      *Summary Judgment Standard*

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. That rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(a).   Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   When construing such factual issues, the Court must view the evidence "in the light most favorable to the [party opposing summary judgment]." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

III.      DISCUSSION

A.      *Voluntariness of Petitioner's October 4, 2010 Confession*

The Court proceeds with review of Petitioner's due process claim by first considering the issue of exhaustion.   Finding the claim unexhausted, the Court will nevertheless consider the claim on its merits.

i.      *Exhaustion and Procedural Bar*

On October 4, 2010, and just one day following R.M.'s death, Petitioner gave a statement to law enforcement in which he claimed that R.M. fractured her skull when he accidentally fell with her down the stairs in their home.   The prosecution admitted the statement into evidence at Petitioner's trial.   Petitioner now objects to the magistrate judge's conclusion that his October 4, 2010 statement to law enforcement was not the product of coercion.

5

Before taking up the merits of this objection, the Court addresses whether the claim has been adjudicated on the merits at the state level.   In his state habeas corpus petition, Petitioner presented the substance of his coercion argument as an ineffective assistance of counsel claim based upon trial counsel's failure to successfully exclude the statement from admission into evidence.   The § 2254 Petition, however, raises the claim as a violation of his due process right to be free from a coerced statement.[1]   In other words, though the claims share the same factual basis, the source of relief differs.   The magistrate judge noted this distinction but did not find it significant.   She thus found that Petitioner exhausted the claim and applied AEDPA deference.

As stated previously, a § 2254 habeas petitioner must exhaust available state court remedies before a federal district court can entertain his claims.   28 U.S.C. § 2254(b)(1)(A); *see Coleman v. Thompson*, 501 U.S. 722, 731 (1991) (noting that principles of comity allow the state judicial system "the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights").   "To exhaust state remedies, a habeas petitioner must fairly present the substance of his claim to the state's highest court."   *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998) (citing *Matthews v. Evatt*, 105 F.3d 907, 910–11 (4th Cir. 1997)).   This requirement is not met "if the petitioner presents new legal theories or factual claims for the first time in his federal habeas

---

[1] More precisely, Petitioner's state habeas petition stated: "Counsel rendered ineffective assistance under the State and Federal Constitution by virtue of his deficient performance in protecting and litigating the denial of Petitioner's Constitutional right to be free from a coerced statement." (Resp. Ex. 7 At 3, ECF 9-1 at 71.)   On appeal from the denial of that petition, Petitioner again couched the coercion argument in terms of ineffective assistance, claiming his counsel "[f]ail[ed] to have Petitioner take the witness stand, during the hearing to suppress statement, to introduce testimonial evidence that his statement to detectives was in fact the product of coercion which resulted in Petitioner's free will having been overborne [and] [f]ail[ed] to provide the trial [c]ourt with binding authority to support the claim that Petitioner's statement was involuntary." (ECF No. 9-2 at 14.)   By contrast, the § 2254 Petition takes up the argument as a direct due process challenge, alleging that "Petitioner stands convicted and imprisoned in violation of the Fifth Amendment to the United States Constitution by the denial of his Constitutional right to be free from a coerced statement." (ECF No. 2 at 5.)

6

petition." *Id.*   Rather, the grounds upon which the petitioner relies must have been presented "face-up and squarely," with the federal question "plainly defined."   *Mallory v. Smith*, 27 F.3d 991, 995 (quoting *Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir. 1998)).   Satisfaction of the "fairly presented" requirement thus requires reference to "a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue.   Presenting a claim that is merely similar to the federal habeas claim is not sufficient[.]"   *Cox v. Burger*, 398 F.3d 1025, 1031 (8th Cir. 2005) (quoting *Barrett v. Acevedo*, 169 F.3d 1155, 1161–62 (8th Cir. 1999)); *see Duncan v. Henry*, 513 U.S. 364, 366 (per curiam) ("[M]ere similarity of claims is insufficient to exhaust." (citation omitted)).   "[T]he petitioner bears the burden of demonstrating that state remedies have, in fact, been exhausted."   *Mallory*, 27 F.3d at 994.

The Court finds that Petitioner's due process claim was not fairly presented to the state court and is therefore unexhausted.   Though the October 4, 2010 statement to police serves as the factual predicate for the both claims, "ineffective assistance and due process are analytically distinct."   *Medicine Blanket v. Brill*, 425 Fed. Appx. 751, 754 (10th Cir. 2011); *see Gattis v. Snyder*, 278 F.3d 222, 237 (3d Cir. 2002) (finding due process claim unexhausted at the federal level where it had been presented to the state court as an ineffective assistance claim); *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) (noting Fourth and Sixth Amendment claims "are distinct, both in nature and in the requisite elements of proof").   The state court evaluated Petitioner's coercion argument solely through the lens of ineffective assistance of counsel and never considered the merits of Petitioner's related due process claim.   *See Baldwin v. Reese*, 541

U.S. 27, 32 (2004) ("[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief.").

This conclusion does not end the matter, however, because "[a] claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court." *Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000) (citing *Gray v. Netherland*, 518 U.S. 152, 161 (1996)). Stated differently, "[a] habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer available to him." *Coleman v. Thompson*, 501 U.S. 722, 732 (1991) (citations omitted). In such a case, the procedural bar "provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Id.* (internal quotation marks omitted); *Dretke v. Haley*, 541 U.S. 386, 388 (2004) ("[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default.").

Under West Virginia law, a habeas claim that has not been presented to state court has generally been defaulted. *See* W. Va. Code § 53-4A-1(c);[2] *Talbert v. Plumley*, No. 3:14-cv-

---

[2] This statute states, in pertinent part:

> [A] contention or contentions and the grounds in fact or law relied upon in support thereof shall be deemed to have been waived when the petitioner could have advanced, but intelligently and knowingly failed to advance, such contention or contentions . . . in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or in any other proceeding or proceedings instituted by the petitioner to secure relief from his conviction or sentence, unless such contention or contentions and grounds are such that, under the Constitution of the United States or the Constitution of this State, they cannot be waived under the circumstances giving rise to the alleged waiver.

W. Va. Code § 53-4A-1(c).

22222, 2015 WL 5726945, at *1 (S.D.W. Va. Sept. 30, 2015) (interpreting § 53-4A-1(c) to find that habeas petitioner procedurally defaulted on claims that he failed to advance "on either his direct appeal or his state habeas appeal").   Though it appears that Petitioner has defaulted on his due process claim, further consideration of default is unwarranted where the Court can more easily dispense with the claim on its merits.   *Yeatts v. Angelone*, 166 F.3d 255, 261 (4th Cir. 1999) ("[O]n occasion the determination of whether a petitioner has defaulted his claims will present difficult issues of state law that are not readily susceptible to decision by a federal court, while the claim advanced by the petitioner patently is without merit.   In such a situation, a federal habeas court would not be justified in considering the procedural default issue."); *see also Clagett v. Angelone*, 209 F.3d 370, 383 (4th Cir. 2000) ("[B]ecause we reject the ineffective assistance of trial counsel claim on its merits, we do not also address whether Clagett has shown cause for his failure to exhaust the claim in state court and for its certain procedural default if brought now."). This approach also avoids any need to invite briefing on the procedural default issue, which neither party has addressed.

ii.   *Merits of Due Process Claim*

An involuntary statement violates the Due Process Clause incorporated in and held against the states by the Fourteenth Amendment.   A confession is involuntary if "the defendant's will has been overborne or his capacity for self-determination critically impaired."   *United States v. Umaña*, 750 F.3d 320, 344 (4th Cir. 2014) (quoting *United States v. Braxton*, 112, F.3d 777, 780 (4th Cir. 1997) (en banc).   The Court must consider the totality of the surrounding circumstances in making this determination, such as the characteristics of the defendant, including his age, level

9

of education, and intelligence, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), as well as the setting of the interview and the details of the interrogation.   *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (citation omitted).   The analysis rarely turns on the "presence or absence of a single controlling criterion."   *Schneckloth*, 412 U.S. at 226.   Although at trial the prosecution bears the burden to establish the voluntariness of a confession by a preponderance of the evidence, on collateral review that burden shifts to the petitioner. *See Degraffenreid v. McKellar*, 883 F.2d 68, *2 (4th Cir. 1989) (table decision) (citing *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir.) (on remand from 474 U.S. 104), *cert. denied*, 479 U.S. 989 (1986)).

Petitioner claims that his limited admission to his role in R.M.'s death was coerced by law enforcement.[3]   Detectives coaxed the statement at issue from him during a two and one-half hour interview held on October 4, 2010, the day following R.M.'s death.   The interview took place in the kitchen of the South Charleston Police Station, where Petitioner agreed to be interviewed, acknowledged his understanding that he was not under arrest and free to leave at any time, and executed a waiver of his *Miranda* rights.[4]   (ECF No. 9-2 at 130–31.)   Petitioner was familiar with both the setting and his interviewers because he had given them an initial statement at the same location three days earlier.   The interview began casually, with Petitioner offering a chronological

---

[3] The Court purposefully avoids labeling this statement as a confession because the parties agreed at trial that Petitioner's description of the manner in which R.M. was injured was incredible.   Not only was it unlikely that Petitioner fell down his stairs in the manner he described, but R.M.'s injuries were not consistent with this type of fall.   The prejudice that resulted from the admission of this evidence was perhaps lessened somewhat because the jury could not reasonably have accepted this account of events as fact.   Still, the statement is the only piece of direct evidence affirmatively linking Petitioner to R.M.'s injuries and imparting responsibility to him for their commission.

[4] Petitioner's valid Miranda waiver is critical to the evaluation of his coercion claim, as the Supreme Court has established that a suspect who has executed a valid waiver of his right against self-incrimination will rarely be able to establish a colorable challenge to the voluntariness of a subsequent confession.   *Berkemer v. McCarty*, 468 U.S. 420, 433 n. 20 (1984).

account of his activities with R.M. on the day in question.   Petitioner insisted that the day had proceeded normally until R.M. suddenly lost consciousness in the car on the way to pick up her mother from work.   He repeatedly denied knowledge of how the child fractured her skull, though he admitted that she was in his exclusive care during the time the State medical examiner surmised the injury must have been inflicted.[5]   His claim of ignorance was met with increasing skepticism from the detectives, who repeatedly petitioned him to confess the truth.   (ECF No. 9-2 at 143–44, 147, 152.)   The detectives made no attempt to hide their suspicion that Petitioner perpetrated the injury.   As he continued to deny hurting the child, they called him a liar.   (*See id.* 142–143.)

Given their view of the evidence, the detectives presented Petitioner's predicament in terms of two options: he could either continue to feign ignorance and, from his silence, be treated as a remorseless killer, or otherwise confess to an accident resulting from a brief fit of rage or lapse in judgment and receive mercy.   As the interview proceeded, Petitioner became obviously intrigued by the idea that confession to an accidental injury could result in a less severe sentence.   He asked the detectives if he would be "put away" if R.M.'s injuries were accidentally inflicted.   (ECF 9-2 at 154–55.)   It is the detectives' subsequent attempts to distinguish between an accidental, as opposed to a deliberately inflicted, injury which Petitioner claims amounted to coercion.   He finds the following two portions of dialogue particularly objectionable:

Q:     . . . If it's an accident, we would deal with it.   Accidents happen all the time.

A:     And you'd still put me in jail.

Q:     That's not true.   If an accident happened, an accident happened.   Accidents happen all the time.   I investigate lots of accidents.

---

[5] R.M.'s autopsy was conducted between Petitioner's first and second interviews with law enforcement. Detective Cook, who was present for at least part of the autopsy, was so convinced that the autopsy findings implicated Petitioner in the child's death that he sought out Petitioner for a second interview.

A:      And do those people still do time?

Q.      No.   There's a difference between an accident and something with malice.

(ECF No. 9-2 at 155.)   Later on, Petitioner again pressed the detectives to tell him the "best case

scenario" if he admitted knowledge of the circumstances surrounding R.M.'s death:

A:      I'm saying what is a judge going to do to me?

Q:      I . . . I will tell you if we go in there and you tell him that this baby was a
        hundred percent fine . . . when you put her in the car seat[,] [a]nd you
        showed up ten minutes later with this much damage . . . they're gonna' say
        you're just a fat liar and . . .

Q:      I'm saying that it's an accident.

A:      . . . If it's a hundred percent an accident, it'll be a completely different story.

Q:      That's what I want to know.

A:      If it was a hundred percent an accident, you would probably be free to leave
        once it's dealt with.   You might get charged with lying to us at the
        beginning of this because you . . . you had no . . . you shouldn't have done
        that.

(ECF No. 9-2 at 160–61.)

Reviewing this transcript, the magistrate judge concluded that while the interviewing

detectives "certainly emphasized the positive aspects of Hayes providing a statement describing

R.M.'s death as accidental . . . the detectives never unambiguously promised that Hayes would

receive a lesser sentence or would not be criminally charged for R.M.'s death."   (PF&R at 39.)

Petitioner disagrees, arguing that the detectives unequivocally promised him that "if he informed

[them] of what they wanted to hear, they would allow him to leave."   (Objs. to PF&R at 1.)

Petitioner rightly notes that illusory promises of leniency may be sufficient to overbear the

will of the criminal accused.   *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (finding

that the existence of implied promises "does not automatically render a confession involuntary," because the root issue is whether the suspect's capacity for self-determination was overcome); *see United States v. Lewis*, 24 F.3d 79, 82 (10th Cir. 1994) (distinguishing false promises from "limited assurances" that do not taint the voluntariness of an ensuing statement).   Even when viewed from Petitioner's perspective, however, *Grades v. Boles*, 398 F.2d 409, 412 (4th Cir. 1968), the Court is unconvinced that the detectives' statements could have led to an involuntary admission. Examining the statements in context of the entire interview transcript, it is plain that the detectives never promised or impliedly offered exoneration in exchange for a confession.   Rather, they truthfully suggested the possibility of more lenient treatment on Petitioner's truthful and accurate admission to his involvement in an accidental event.

A detective's truthful statements about a suspect's predicament "are not the type of 'coercion' that threatens to render a statement involuntary."   *United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987).   The detectives arrived at the interview armed with evidence clearly pointing to Petitioner's culpability.   Met with his incredible claim of ignorance, the detectives did not coerce his admission to an accidental event by merely pointing out the harsher reception he would face if he continued to deny the obvious.   As the Supreme Court has recognized, "very few people give incriminating statements in the absence of official action of some kind."   *Schneckloth*, 412 U.S. at 224; *see Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir. 1991) ("[W]e have no doubt that effective interrogation techniques require, to some extent, a carrot-and-stick approach to eliciting information from an uncooperative suspect.").   Moreover, drawing Petitioner's attention to the potential legal consequences of his actions was not patently coercive.   "[T]elling the defendant in a noncoercive manner of the realistically expected penalties and encouraging him to

13

tell the truth is no more than affording him the chance to make an informed decision with respect to his cooperation with the government." *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990) (internal quotation marks and citation omitted).

Furthermore, the Court simply does not accept Petitioner's assertion that he believed the detectives to be promising immediate release in exchange for an inculpatory statement. The detectives told Petitioner that regardless of the content of any confession, he would be processed, presented before a magistrate, and then left to "work it out with the prosecutor." (ECF No. 9-2 at 156.) They acknowledged that his admission to any involvement in the child's death might result in him being "put away," but that the "putting away part [would] be a lot worse for somebody who shows no remorse." (ECF No. 9-2 at 157.) Petitioner's own statements during the interview prove that he was acutely aware of the risks before him and belie his current assertion that he inculpated himself with the belief that he would not be criminally charged. Immediately following their discussion of the difference between accidental and malicious acts, Petitioner remarked, "[y]ou're going to take me and process me any way it goes." (*Id.* at 161.) The detective agreed, admitting that Petitioner's imminent arrest was "[m]ore than likely." (*Id.*) Again, Petitioner acknowledged his understanding, stating, "[w]hen I leave here today, it's going to be in handcuffs." (*Id.*) He even asked before offering the critical statement which one of the detectives would take him "downtown" for booking. (*Id.* at 164.)

Furthermore, even if the detectives' statements highlighting the benefits of confessing to an accidental incident constituted implied promises of leniency, the surrounding circumstances do not indicate that Petitioner's "will [was] overborne or his capacity for self-determination critically impaired." *Umaña*, 750 F.3d at 344. Petitioner maintained an awareness throughout the interview

14

that the evidence inexorably pointed to him as the one who caused R.M.'s injuries and appeared to be weighing the benefits of implicating himself in an accidental, as opposed to a purposeful, event.   And for the detectives' best efforts, Petitioner never offered an account of the alleged accident that comported with the medical evidence.   *See id.* at 345 (placing significance on the fact that the defendant withstood the interviewer's attempt to extract a murder confession when evaluating the voluntariness of his limited statement).   For all their frustration, the detectives conducted the interview in an amiable manner.   They reminded Petitioner at several points during the interview that he was not under arrest, (ECF No. 9-2 at 130–31, 161), and invited him outside to take a smoke break, (*id.* at 159–60, 183, 187–88).   There is not the slightest hint of threats or intimidation on their part.   In fact, the interview concludes with a surprisingly lighthearted discussion of the video game Petitioner played on the day R.M. allegedly sustained her fatal injuries.   (ECF No. 9-2 at 185–87.)

In light of the countervailing contextual factors, the Court does not believe that the detectives' suggestion that Petitioner would not serve prison time if R.M.'s injuries were purely accidental overcame his capacity for self-determination.   Therefore, the Court **FINDS** that Petitioner has not met his burden to demonstrate that his limited—and subsequently discredited—admission to injuring R.M. was involuntary.

B.     *Ineffective Assistance of Counsel Claims*

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel.   U.S. Const. Amend. XI.   As established by *Strickland*, "[a]n ineffective assistance claim has two components: [1] [a] petitioner must show that counsel's performance was deficient, and [2] that the deficiency prejudiced the defense."

*Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  "A defendant asserting an [ineffective assistance] claim must . . . satisfy both prongs, and a failure of proof on either prong ends the matter."  *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004) (citing *Williams v. Kelly*, 816 F.2d 939, 946–47 (4th Cir. 1987)).

Under the deficient-performance prong, the petitioner's burden is to "demonstrate that his counsel's performance fell below an objective standard of reasonableness."  *Clagett*, 209 F.3d at 380 (citing *Strickland*, 466 U.S. at 687).  "[C]ounsel's performance will not be deemed deficient except in those relatively rare situations where, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.'" *Tice v. Johnson*, 647 F.3d 87, 102 (4th Cir. 2011) (quoting *Strickland*, 466 U.S. at 690).  In an effort to avoid "the distorting effects of hindsight," *Strickland*, 466 U.S. at 689, a court reviewing an ineffective assistance of counsel claim "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689).

"Once a petitioner has established deficient performance, he must prove prejudice—'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Winston v. Pearson*, 683 F.3d 489, 505 (4th Cir. 2012) (quoting *Richter*, 562 U.S. at 104).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 694 (internal quotation marks omitted)).  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' . . . The likelihood of a different result must be substantial, not just conceivable."  *Id.* at 104, 112 (quoting *Strickland*, 466 U.S. at 693).  "In

sum, '[t]aking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.'" *Elmore v. Ozmint*, 661 F.3d 783, 858 (4th Cir. 2011) (quoting *Strickland*, 466 U.S. at 696).

 "Surmounting *Strickland*'s high bar is never an easy task[, and] [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (citation and internal quotation marks omitted). This is so because a federal court reviewing a state court's habeas decision must apply the AEDPA and the *Strickland* standards simultaneously. *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012) (citing *Richter*, 562 U.S. at 105). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (citations omitted); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (explaining that the "doubly deferential" standard of review "gives both the state court and the defense attorney the benefit of the doubt"). "The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Richter*, 562 U.S. at 105 (citation omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable." *Id.* Rather, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* A reviewing court may decide either component of an ineffective assistance claim first and need not address both the deficient performance and prejudice prongs if the petitioner makes an insufficient showing on one. *Strickland*, 466 U.S. at 697.

   *i. Effectiveness of Counsel in Cross-Examination of Dr. Allen Mock*

17

Petitioner argues that the magistrate judge erred by finding that the West Virginia Supreme Court of Appeals did not unreasonably apply the *Strickland* standard when it affirmed the denial of Petitioner's ineffective assistance of counsel claim related to counsel's cross-examination of Allen Mock, M.D.   Though the Court finds itself in ultimate agreement with the magistrate judge, its reasoning differs.

At the time of trial, Dr. Mock was employed as a deputy chief medical examiner at the West Virginia Office of the Chief Medical Examiner.   (ECF No. 9-5 at 182; ECF No. 9-6 at 98–99.)    He performed R.M.'s autopsy on October 4, 2010.   (ECF No. 9-5 at 189.)   He testified at trial on behalf of the prosecution and opined to a reasonable degree of medical certainty that R.M.'s skull fracture was the product of child abuse.   (ECF No. 9-6 at 83.)   Petitioner now claims that Dr. Mock was unqualified to perform autopsies under West Virginia law and that his trial attorney provided ineffective assistance by failing to identify and highlight Dr. Mock's vocational deficiencies on cross-examination.   It appears uncontroverted that defense counsel "extensively questioned Dr. Mock about his qualifications, findings, and opinions."[6]   (PF&R at 44.)   Thus, Petitioner's argument on the "deficient performance" prong appears to be limited to the factual question of whether Dr. Mock was, in fact, qualified to perform autopsies on behalf of the State of West Virginia.

West Virginia law sets forth mandatory minimum qualifications for pathologists performing autopsies on behalf of the state medical examiner.   There are two routes to qualification.   By statute, the chief medical examiner may employ pathologists who either "hold[] board certification or board eligibility in forensic pathology or ha[ve] completed an American

---

[6] In the same vein, the state circuit court found that defense counsel "vigorously cross-examined Dr. Mock regarding his experience and credentials." (ECF No. 9-1 at 142.)

board of pathology fellowship in forensic pathology to make the autopsies." W. Va. Code § 61-12-10(a) (2000). Petitioner disputes whether Dr. Mock met these qualifications at the time of trial. It is uncontroverted that Dr. Mock was neither board certified nor board eligible in forensic pathology at the time of trial.[7] The locus of this dispute centers on whether he had completed the required fellowship. Though Dr. Mock testified that he completed a forensic pathology fellowship at the New Mexico University Office of the Chief Medical Examiner, (ECF No. 9-5 at 183), neither the state prosecutor nor Petitioner's defense attorney inquired whether that fellowship was recognized by the American Board of Pathology. Since Dr. Mock and the defense pathology expert offered competing opinions regarding the age of R.M.'s skull fracture, Dr. Mock's credibility—and, similarly, the weight his opinions deserved—was a key issue at trial. Petitioner claims his counsel rendered ineffective assistance by failing to ascertain whether Dr. Mock was qualified to perform the autopsy in the first place.

Petitioner raised this argument in his state habeas petition, where it was rejected as non-meritorious by the state circuit court. In considering Petitioner's claim, the circuit court noted that the first method of employment qualification, board certification or eligibility, was inapplicable since Dr. Mock admitted that he was not board eligible in forensic pathology. This left the second method, that requiring completion of an American Board of Pathology fellowship, as the only option. *See* W. Va. Code § 61-12-10(a) (2000). The circuit court noted that Dr. Mock had completed a pathology fellowship with the University of New Mexico. Conspicuously absent from the circuit court's order, however, is a finding that Dr. Mock's prior fellowship met the

---

[7] Dr. Mock testified that he was board eligible in anatomic pathology, but that he had not yet gained board eligibility in forensic pathology. (*See* ECF No. 9-5 at 184.) He explained that the American Board of Pathology requires successful passage of the anatomic and clinical pathology boards before a pathologist is board eligible in forensic pathology. (ECF No. 9-6 at 10.)

statutory requirements for employment with the medical examiner.   Though its ultimate decision to reject Petitioner's claim must have hinged on that assumption, the circuit court offered no explanation for this conclusion.[8]   (ECF No. 9-1 at 141.)   The West Virginia Supreme Court of Appeals summarily adopted this aspect of the circuit court's opinion.    (ECF No. 9-2 at 124–25.) On this point, the magistrate judge concluded that the state court made a factual finding entitled to deference.

AEDPA sets forth two "independent requirements" for review of state-court factual findings.   *See Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).   Section 2254(d)(2) provides that a federal court may not grant habeas relief unless the state court proceedings "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."    Further, under § 2254(e)(1), the state court's determination of a factual issue must be presumed to be correct.   The petitioner bears the burden to rebut this presumption by clear and convincing evidence.   *Id.*   "The two provisions, operating in tandem, require that 'to secure habeas relief, petitioner must demonstrate that a state court's finding . . . was incorrect by clear and convincing evidence, and that the corresponding factual determination

---

[8] With regard to this claim, the circuit court stated in conclusory manner:

There is no dispute that Dr. Mock, at the time [R.B.]'s autopsy was performed, was not board certified in forensic pathology.   However, Dr. Mock testified that he completed fellowship training in forensic pathology at the New Mexico University Office of the Chief Medical Investigator in Albuquerque.   Dr. Mock also testified that he had testified as an expert witness in the field of forensic pathology in both New Mexico and West Virginia state courts and federal courts. . . . Dr. Mock's curriculum vitae clearly indicates that he served as a Forensic Pathology Fellow from July 2009 until June 2010.   The Court **FINDS** Petitioner simply fails to establish that Dr. Mock was not qualified to perform an autopsy in West Virginia and fails to establish that Dr. Mock was not qualified as an expert witness.
(ECF No. 9-1 at 141.)

20

was objectively unreasonable in light of the record before the court.'" *Merzbacher v. Shearin*, 706 F.3d 356, 364 (4th Cir. 2013) (quoting *Miller-El*, 537 U.S. at 348).

AEDPA thus poses a formidable hurdle for a habeas petitioner challenging the correctness of a state court's factual findings.   Nonetheless, the Court disagrees with the magistrate judge that the state court made a factual determination of this issue.   The state court simply made no finding as to Dr. Mock's fellowship, and its summary conclusion that Petitioner "failed to establish that Dr. Mock was not qualified to perform an autopsy in West Virginia," (ECF No. 9-1 at 141), does not suffice—particularly where, as discussed below, Petitioner requested an evidentiary hearing to develop his factual allegations.   Section 2254(d) deference does not apply.   *Winston v. Kelly*, 592 F.3d 535, 557 (4th Cir. 2010) (finding where state court "passed on the opportunity to adjudicate [the petitioner's] claim on a complete record," the district court should not afford any deference to the state court's application of the *Strickland* standard).

### 1.   Standard for Evidentiary Hearing

A related question is whether Petitioner has been prevented from developing evidence to undermine Dr. Mock's qualifications.   In his objections, Petitioner claims that he has "*consistently* been trying to obtain counsel and a hearing" for the purpose of developing his theory that Dr. Mock was unqualified at the time of trial to perform autopsies.   (ECF No. 16 at 2 (emphasis in original).) Petitioner did not request an evidentiary hearing in his § 2254 Petition, nor has he explicitly done so in his objections to the PF&R.   Still, because Petitioner raises the underlying factual question, the Court finds that the § 2254 Petition and subsequent objections, construed liberally, request an evidentiary hearing.   *See Jehovah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015) (affording pro se pleadings liberal construction).

21

Section 2254(e)(2) "controls whether [a] petitioner may receive an evidentiary hearing in federal district court on . . . claims that were not developed in the [state] courts." *Taylor*, 529 U.S. at 429. That statute provides the following:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

"The Supreme Court has held that the word 'failed' in the opening line of this section connotes fault." *Winston*, 592 F.3d at 552 (citing *Taylor*, 529 U.S. at 431). Specifically, the Supreme Court stated that, "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Taylor*, 529 U.S. at 432. "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court . . . ." *Id.* at 435. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437. "Importantly, the [Supreme] Court further explained that, in determining whether a petitioner has

been diligent, '[t]he question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts.'" *Wolfe v. Johnson*, 565 F.3d 140, 167 (4th Cir. 2009) (quoting *Taylor*, 529 U.S. at 435). "If the petitioner was diligent in pursuing the claim in state court, he cannot have 'failed to develop' the claim, and § 2254(e)(2) does not bar an evidentiary hearing." *Id.* at 167 (citing *Taylor*, 529 U.S. at 430).

Nonetheless, "[f]ederal evidentiary hearings ought to be the exception, not the rule." *Kelly*, 592 F.3d at 552 (citation omitted). Evidentiary hearings "are not 'intended to provide a forum in which to retry state cases,' but rather their 'prototypical purpose [is] to fill a gap in the record or to supplement the record on a specific point.'" *Id.* (alteration in original) (quoting *Pike v. Guarino*, 492 F.3d 61, 70 (1st Cir. 2007)). "[A] § 2254 petitioner bears the burden of demonstrating that he was diligent in pursuing his claims in state court." *Wolfe*, 565 F.3d at 167 (citing *Taylor*, 529 U.S. at 440). In sum, if Petitioner failed to develop the factual basis for his claim in state court, this Court is precluded from granting an evidentiary hearing unless Petitioner satisfies one of § 2254(e)(2)'s narrow exceptions.

From the state court post-conviction record originally provided, it appeared that Petitioner had not diligently sought to develop the factual basis for his claim in state court. There was no record evidence, for example, that Petitioner had requested discovery or an evidentiary hearing. However, in his brief appealing the circuit court's denial of his habeas petition to the West Virginia Supreme Court of Appeals, Petitioner cited previously-filed motions for appointment of counsel, for an expert witness, for a private investigator, and for an omnibus habeas corpus hearing, all of which he alleged the circuit court had essentially ignored. (ECF No. 9-2 at 5.) None of these motions were present in the record before this Court. By Order entered in this case on August 17,

2016, the Court ordered Respondent to supplement the record with these motions.   (ECF No. 18.)
Respondent complied on August 18, 2016 and submitted the following as supplementation of the
state court post-conviction record: Petitioner's motion for appointment of counsel, motion for
expert witness, Petitioner's motion for omnibus habeas corpus hearing, and Petitioner's motion for
private investigator.[9]

These motions each constitute an attempt by Petitioner to factually develop his challenge
to Dr. Mock's qualifications during the pendency of the state post-conviction proceeding.   For
example, in support of his motion for a private investigator, Petitioner alleged:

> Petitioner has raised in his habeas corpus petition, the claim that the State Medical
> Examiner, at the time of the autopsy on R.M., did not possess the qualifications to
> be Chief Medical Examiner pursuant to West Virginia Code § 61-12-3(c) or the
> qualifications to perform autopsies pursuant to West Virginia Code § 61-12-3(c).
> . . . A private investigator is needed in the instant case to investigate and obtain the
> evidence needed to establish the qualifications of Doctor Mock at the time of his
> conducting the autopsy on R.M.

(ECF No. 19-1 at 9.)   Respondent included with its supplementation an order from the state circuit
court denying Petitioner's motion for appointment of counsel.[10]   (ECF No. 19-2.)   It appears that
the circuit court did not rule on the other motions, including Petitioner's motion for an evidentiary
hearing.   Further, the circuit court's order denying habeas relief does not mention, much less
consider the necessity of, Petitioner's request for an evidentiary hearing.

The circuit court's oversight is particularly problematic because Rule 9(a) of the West
Virginia Rules Governing Post-Conviction Habeas Corpus Proceedings require the circuit court,

---

[9]  The four motions were stamped by the Circuit Court of Kanawha County as filed on April 24, 2014—
approximately four months before the circuit court issued its decision denying Petitioner's request for
collateral relief.

[10]  The circuit court's order denying the motion for appointment of counsel was not issued until November
6, 2014, months after the court denied Petitioner's habeas petition.

whether or not a motion for an evidentiary hearing is presented, to "include in its final order specific findings of fact and conclusions of law as to why an evidentiary hearing was not required." The circuit court's order did not comply with this directive.   *Conway v. Polk*, 453 F.3d 567, 576–77 (4th Cir. 2006) (finding § 2254(e)(2) does not preclude an evidentiary hearing where the petitioner's failure to fully develop his claim was due to external causes).   It is clear Petitioner exercised diligence in pursuing the factual development of this claim in state court, and the Court **FINDS** that § 2254(e)(2) does not bar an evidentiary hearing.

### 2.   *Petitioner's Entitlement to Evidentiary Hearing*

"Even if the petitioner's claim is not precluded by § 2254(e)(2), that does not mean he *is* entitled to an evidentiary hearing—only that he *may* be."   *Fullwood v. Lee*, 290 F.3d 663, 681 (4th Cir. 2002) (quoting *McDonald v. Johnson*, 139 F.3d 1056, 1059–60 (5th Cir. 1998)) (internal quotation marks omitted, emphasis in original).   Fourth Circuit precedent dictates that a § 2254 petitioner

> who has diligently pursued his habeas corpus claim in state court is entitled to an evidentiary hearing in federal court, on facts not previously developed in the state court proceedings, if the facts alleged would entitle him to relief, and if he satisfies one of the six factors enumerated by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 313 (1963).

*Conaway*, 453 F.3d at 582.   The six *Townsend* factors are: (1) the merits of the factual dispute were not resolved at the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason

it appears that the state trier of fact did not afford the habeas petitioner a full and fair fact hearing. 372 U.S. at 313.

First, the Court finds that because Petitioner raises a legitimate suspicion that Dr. Mock was not credentialed at the time of trial to perform autopsies for the state medical examiner but was not afforded a hearing to develop the issue, he satisfies at least one of the *Townsend* factors. *See Fullwood*, 290 F.3d at 681 (finding habeas applicant satisfied *Townsend* factors where state court had refused him an evidentiary hearing).

Second, the Court must consider where Petitioner has alleged facts that, if true, would permit him to prevail on his ineffective assistance claim. This places the Court back at the starting point to consider Petitioner's likelihood of satisfying *Strickland's* "deficient performance" and "prejudice" prongs. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700. The Court begins by assuming that Dr. Mock did not meet minimum employment qualifications and then considers whether Petitioner can show prejudice resulting from his counsel's failure to bring this fact to the jury's attention.

In considering *Strickland*'s prejudice prong, the Court must stress the limited implications of Petitioner's factual allegations. Accepting as true the allegation that Dr. Mock's fellowship was not an American Board of Pathology fellowship, Dr. Mock would have been unqualified at the time of trial to conduct autopsies on behalf of the State of West Virginia. Petitioner has presented no evidence, however, to show that Dr. Mock's failure to meet the employment qualifications for a particular office rendered him unfit to perform autopsies generally. To the

contrary, the trial transcript reveals that Dr. Mock was a well-qualified pathologist.[11]   Neither has

Petitioner presented evidence calling into question the trial court's decision to recognize Dr. Mock

as an expert in the field of forensic pathology.    (ECF No. 9-5 at 186–87.)   In other words,

Petitioner's allegations do little to undermine the intrinsic validity of Dr. Mock's autopsy findings.

Dr. Mock's opinion that the fracture was caused by a high impact force, his description of the age

of the fracture, and, importantly, his characterization of R.M.'s death as a homicide, could have

reasonably been adopted by the jury even if Dr. Mock's fellowship was not an American Board of

Pathology fellowship.   Petitioner's arguments notwithstanding, this fact does not lead to the

inexorable conclusion that the jury would have accepted the opinions of his pathologist over Dr.

Mock's.   Dr. Mock's findings were also reviewed and endorsed by James A. Kaplan, the then-

chief medical examiner for the State of West Virginia, (*id.* at 189), and Petitioner has not

challenged Dr. Kaplan's qualifications.

Even if Dr. Mock was unqualified to work in the Chief Medical Examiner's office, his

crucial finding that R.M.'s skull fracture was fresh, and more than likely inflicted while she was

in Petitioner's sole care, was bolstered by the testimony of R.M.'s treating pediatrician, Manuel

Caceres, M.D., and by the testimony of R.M.'s mother.   Dr. Caceres presided over R.M.'s medical

care once she was admitted to the pediatric intensive care unit of Women and Children's Hospital

on September 30, 2010.  (ECF No. 9-7 at 150.)   The trial court recognized him as an expert in

---

[11] Dr. Mock testified that he had completed a master's degree in microbiology, immunology, and parasitology before entering and completing medical school.   Following medical school he had training in anatomic and forensic pathology at the University of Tennessee, and completed his fellowship training in forensic pathology at the New Mexico University Office of the Chief Medical Examiner.   (ECF No. 9-5 at 183.)   Though he had only been employed with the West Virginia Office of the Chief Medical Examiner for approximately twelve months at the time of trial, he estimated that he had already performed 550 autopsies during the course of his career.   Approximately ten percent of those autopsies were conducted on children.   (*Id.* at 185.)

the field of pediatric intensive care.   (*Id.* at 149.)   Dr. Caceres agreed with Dr. Mock that R.M.'s skull fracture was of the size typically only observed on children in high-impact car accidents or who have sustained other significant trauma.   (*Id.* at 169.)   He sided with Dr. Mock over defense expert Dr. Thomas Young, who would later testify that R.M.'s skull injury could have resulted from a minor fall from the living room stairs that occurred several days prior to September 30, 2010.   Further, Dr. Caceres opined that Dr. Young theory that R.M.'s cardiac arrest was triggered by a post-traumatic seizure was fanciful.   The child's brain swelling was too severe, he reasoned, to have been brought about merely by oxygen deprivation.   He testified that the head injury, not a seizure, was responsible for cutting off the oxygen supply to the brain and precipitating the chain of events resulting in the child's death.

The testimony of R.M.'s mother, M.B., also undermined Dr. Young's opinion and, in turn, lent credibility to Dr. Mock's conclusions.   M.B. offered a crucial first-hand account of R.M.'s fall from the living room stairs on September 24, 2010.[12]   M.B. testified that her daughter was sitting on the bottom step of the stairwell when M.B. called to her.   As R.M. stood to respond to her mother, she fell backward and landed on her backside.   (ECF No. 9-5 at 98.)   A four-wheeler toy was present on the living room floor adjacent to the steps, and though M.B. admitted that her view of R.M.'s fall was partially blocked by this toy, she testified that the four-wheeler did not move as her daughter fell.   She added that she did not see or hear R.M. hit her head as she was falling.   (*Id.* at 98.)   Further, her description of R.M.'s reaction to the fall was not consistent with that of a child who had just sustained a five-inch skull fracture.   M.B. testified that her daughter cried briefly, but calmed immediately and "was fine."   (*Id.*)   M.B. testified that apart from this

---

[12] Dr. Young would later opine that R.M. fractured her skull during this fall on September 24, and not on September 30 while she was in Petitioner's care. (ECF No. 9-8 at 48–49.)

incident, she knew of no other falls or accidents in the days preceding R.M.'s admission to the hospital on September 30, 2010.  (*Id.* at 119.)

Petitioner's assertion that Dr. Mock was not qualified to perform autopsies on behalf of the West Virginia Medical Examiner's Office, if true, would not satisfy *Strickland*'s prejudice prong. Even if the facts as Petitioner alleges them are true, the Court cannot find that a reasonable probability exists that the outcome of the trial would have been different.  *Strickland*, 466 U.S. at 694.  To receive an evidentiary hearing, Petitioner was required to allege facts in the § 2254 Petition entitling him to relief under *Strickland*.  *Conway*, 453 F.3d at 582.  Because he has failed in this regard, the Court must deny his request for an evidentiary hearing.

### ii.  *Effectiveness of Counsel in Arguing Motion for Acquittal*

Lastly, Petitioner challenges the magistrate judge's finding that the state court did not unreasonably apply *Strickland* by denying Petitioner's ineffective assistance of counsel claim relating to the sufficiency of the evidence.  Here, the Court again sustains the position of the magistrate judge and denies Petitioner's claim.

Petitioner contends that his trial counsel failed to litigate the issue of insufficient evidence in his post-trial motion for judgment of acquittal.  On habeas review, the West Virginia circuit court found "more than ample evidence" to support Petitioner's conviction and denied the ineffective assistance claim.  (ECF No. 9-1 at 121–22, 17–18.)  The West Virginia Supreme Court of Appeals adopted the lower court's findings and conclusion on the matter.  (ECF No. 9-2 at 124.)  Upon review of the record, the Court notes that the circuit court based its decision entirely on the prejudice prong and did not express discuss the performance prong.  (ECF No. 9-1 at 142–44.)  The Court therefore reviews the finding that Petitioner was not prejudiced with

AEDPA deference, but conducts a plenary review of whether trial counsel's performance was deficient.   *See Ferrell v. Hall*, 640 F.3d 1199, 1224 (11th Cir. 2011) ("[Where] the state court has denied the petitioner's claim on only one prong of the *Strickland* test . . . we review *de novo* the prong that the state court never reached."); *Earls v. McCaughtry*, 379 F.3d 489, 492 (7th Cir. 2004) (reviewing performance prong *de novo* when state court decided case only on prejudice prong).

Nonetheless, Petitioner fails to satisfy the deficient performance element, in part because he inaccurately portrays his trial counsel's post-trial arguments.   Petitioner creates the impression that his counsel simply did not challenge the sufficiency of the evidence.   The state record reveals otherwise.   Trial counsel attacked the sufficiency of the evidence in both the renewed motion for acquittal and at the subsequent hearing. [13]   (ECF No. 9-1 at 7; ECF No. 9-10 at 72–73.) Admittedly, counsel's post-trial arguments as to insufficiency of the evidence were based predominantly on a juror affidavit acquired after the jury rendered its verdict.   This particular juror, counsel argued, had been unpersuaded by the State's evidence and voted for a verdict of guilty simply because Petitioner was the last person alone with R.M. before the onset of the symptoms.

Counsel's arguments were not limited to the affidavit, however.   He introduced the affidavit at the hearing by calling the trial court's attention to the motion for judgment of acquittal made by the defense following the close of the State's case-in-chief, during which time counsel had strenuously, and methodically, attacked the sufficiency of the State's evidence with regard to malice.   (*See* ECF No. 9-8 at 13–19.)   And in renewing this argument at the post-trial motions

---

[13] As one of many grounds for acquittal, counsel stated: "The conviction should be set aside because the evidence was insufficient to convince a rational trier of fact that the elements of the crime were proven beyond a reasonable doubt[.]" (ECF No. 9-1 at 7.)

hearing, counsel again argued that "the State had put on no evidence whatsoever with regard to the elements of malice or intent."[14]   (ECF No. 9-10 at 73.)   The Court cannot identify any deficiency in counsel's performance, and, perhaps more importantly, Petitioner does not point to any.[15]   Far from "[falling] below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, the Court finds that counsel quite ably presented the sufficiency challenge for the trial court's consideration.   Thus, the Court **FINDS** that Petitioner has failed to show deficient performance of counsel in litigating the sufficiency of the evidence.

AEDPA deference applies to the prejudice prong.   Here, the Court finds that the state court reasonably determined the evidence to be sufficient to support Petitioner's conviction and therefore Petitioner was not prejudiced by any failure by counsel to argue the issue more expansively.   Evidence is sufficient to support a conviction when "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).   Stated conversely, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132

---

[14] In response to the post-trial motion, the trial judge noted that most of the Petitioner's arguments had been previously raised and that he was not going to revisit them.   He then summarily denied the motion.   (ECF No. 9-10 at 88–88.)   The transcript of the post-trial motions hearing leaves one with the impression that the proceeding was basically a *pro forma* opportunity for the trial court to hear brief argument and deny the motion, and that no amount of advocacy would have changed that result.

[15] In fact, in his objections on this issue, Petitioner circles back to draw in his previously recited arguments about Dr. Mock's qualifications, arguing that "[h]ad his trial counsel conducted a thorough review of Dr. Mock's credentials and cross-examined him on his lack of certifications[,] Petitioner would have 'tipped' the scales towards Dr. Young's testimony." (ECF No. 16 at 3.) The Court has already addressed these arguments in its discussion of Petitioner's other ineffective assistance claim, *see* Section III.B.i, *supra*, and Petitioner's decision to rehash them here tells the Court that he has nothing new to offer on the insufficient evidence issue.

S. Ct. 2, 4 (2011) (per curiam).   In evaluating a sufficiency of the evidence challenge, whether in the context of a habeas proceeding or on direct appeal, the jury's verdict is entitled to deference.[16] 28 U.S.C. § 2254(d); *see Cavazos*, 132 S. Ct. at 3 (citation omitted).

> Petitioner's statutory offense of conviction provides:
>
> If any parent, guardian or custodian shall maliciously and intentionally inflict upon a child under his or her care, custody or control substantial physical pain, illness or any impairment of physical condition by other than accidental means, thereby causing the death of such child, then such parent, guardian or custodian shall be guilty of a felony.

W. Va. Code § 61-8D-2a(a).   This offense is similar to the West Virginia offense for second degree murder, *see* W. Va. Code § 61-2-1, with an important difference.   Unlike second degree murder, the offense of death of a child by a parent, guardian, or custodian requires only an intent to harm, not an intent to kill.   *Gerlach v. Ballard*, 756 S.E.2d 195, 202–03 (W. Va. 2013).   Thus, the offense of conviction required proof beyond a reasonable doubt (1) that Petitioner, as R.M.'s custodian; (2) caused the death of R.M., a child; (3) by maliciously or intentionally inflicting substantial physical pain, illness, or any physical impairment; (4) other than by accidental means; (5) while R.M. was in his care, custody, and control.   (*See Jury Instructions*, ECF No. 9-9 at 37–38); *see also id.* (noting generally the distinctions between the elements of proof on second degree murder and death of a child by a parent, guardian, or custodian).

It is undisputed that Petitioner was R.M.'s custodian and that R.M. was in his exclusive care, custody, and control between 8:00 a.m. and 2:00 p.m. on September 30, 2010.[17]   (ECF No.

---

[16] Section 2254(d) applies to the state court's conclusion of law, while § 2254(e) governs findings of fact. To the extent the state court made factual findings in ruling on this particular ineffective assistance claim, they are entitled to a presumption of correctness.   28 U.S.C. § 2254(e)(1).   Further, the Court finds that Petitioner has failed to rebut any factual findings by clear and convincing evidence.

[17] For purposes of Petitioner's offense, the West Virginia Code defines a "custodian" as "a person over the age of fourteen years who has or shares actual physical possession or care and custody of a child on a full-

9-5 at 68, 72–73.)   Neither can Petitioner reasonably dispute, given his expert's agreement on this point, that the skull fracture and subsequent brain edema caused the child's death.   The central point of contention, as identified by Petitioner's trial counsel, is whether Petitioner maliciously or intentionally caused the injury.   West Virginia criminal law uses malice and intent interchangeably, *State v. Davis*, 648 S.E.2d 354, 358 (W. Va. 2007), and defines malice, in part, as "the intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent."[18]   *State v. Burgess*, 516 S.E.2d 491, 493 (W. Va. 1999) (quoting Black's Law Dictionary 956 (6th ed. 1990)).   The West Virginia high court has held that malice can be implied from "any deliberate cruel act."   *State v. Williams*, 543 S.E.2d 306, 312 (W. Va. 2000) (citing *Burgess*, 516 S.E.2d at 493).

At trial, the jury was presented with only two theories explaining R.M.'s fatal injury: either R.M. suffered the skull fracture when she fell from the living room stair on September 24, 2010, or Petitioner inflicted the injury on the child on September 30, 2010 during the hours R.M.'s mother was at work.   Defense expert Dr. Young was the only witness to present evidence consistent with the first theory.   The verdict indicates that the jury accepted the second theory as more persuasive.   Their choice was thoroughly rational.   Viewed in the light most favorable to the prosecution, *Parker*, 132 S. Ct. at 2152, the medical evidence more plausibly supports a theory of intentional injury.   Both Dr. Mock and Dr. Caceres testified that a skull fracture as extensive

---

time or temporary basis, regardless of whether such person has been granted custody of the child by any contract, agreement or legal proceeding."   § 61-8D-1(4).

[18] It appears that the West Virginia Supreme Court of Appeals has never explicitly defined the term "intentional" as it appears in this definition of malice.   Nonetheless, a survey of the case law reveals that West Virginia adopts the widely-accepted definition, that is, that an act is done "intentionally" if done voluntarily and "not because of mistake, accident, [or] innocent reason."   *State v. Goodman*, 290 S.E.2d 260, 265 n. 4 (W. Va. 1981) (quoting from and upholding a jury instruction used by the lower court).

as R.M.'s generally only results from high impact force, such as a car accident with ejection of the child or a fall from a considerable height.   (ECF No. 9-6 at 54; ECF No. 9-7 at 169.)   Though Dr. Young disagreed with this testimony and opined that a fall from a height of just two feet could have produced the fracture, the prosecution impeached him with his own sworn testimony in a previous case in which he had testified that significant force, such as that produced in a vehicular accident, would be required to cause a five-inch fracture like R.M.'s.   (ECF No. 9-8 at 166–67.)

The plausibility of Dr. Young's theory was independently undermined by Dr. Caceres. Dr. Caceres testified that if a post-traumatic seizure occurred on September 30, 2010 as Dr. Young claimed, it would not have caused a cessation of breathing, would not have resulted in the severe, sudden brain swelling observed upon R.M.'s admission to the hospital, and could not have accounted for the brain hemorrhaging observed in the hospital CT scan.   (ECF No. 9-7 at 190–93.)   Rather, Dr. Caceres opined to a reasonable degree of medical certainty that the injury to R.M.'s skull occurred first.   (ECF No. 9-8 at 4.)   Dr. Mock's autopsy findings were all consistent with Dr. Caceres' impressions.   Though Petitioner may remain skeptical of Dr. Mock's qualifications, his opinion that R.M. suffered her injury while in Petitioner's care was supported both by the other medical expert opinion and by the eyewitness account offered by R.M.'s mother of the September 24, 2010 fall.   As explained above, Dr. Young's explanation for the head injury was simply factually inconsistent with the account of R.M.'s mother, who insisted that R.M. did not hit her head when she fell on September 24.   (ECF No. 9-5 at 98.)   Altogether, the medical evidence accepted by the jury clearly pointed to a deliberately inflicted head injury that occurred shortly before Petitioner drove with R.M. to pick up her mother from work on September 30, 2010.

(*See* ECF No. 9-8 at 2 (in which Dr. Caceres testifies that the injury occurred within two hours of R.M. going into cardiac arrest).)

Critical evidence in support of the malice element also came from Petitioner himself. Petitioner gave a statement to law enforcement that he fell down five or six stairs with R.M. in his arms, and that she hit her head as he landed on top of her.   The implausible story conflicted with the overwhelming medical testimony and was accepted by both sides as a fabrication.   Still, the jury could reasonably have concluded from this statement that Petitioner was responsible for R.M.'s injury, although unwilling to divulge the facts with accuracy.   The jury also heard evidence, admitted as part of Petitioner's recorded interview with law enforcement, that he knew R.M. had suffered a head injury but did not call 911 and kept quiet at the hospital while emergency personnel furiously tried to diagnosis R.M.'s condition.   (ECF No. 9-2 at 166–67.)   The jury could infer malice and intent from Petitioner's lie as well as his refusal to divulge the child's head injury to the treating physicians who were desperately trying to identify the cause of her distress and save her life.   *See State v. Fannin*, 2015 WL 2364295, at *5 (W. Va. May 15, 2015) (memorandum decision) (finding the jury was able to infer malice from the defendant's fabricated and discredited account of the victim's injuries).   The trial court reasonably found that sufficient evidence existed to support the malice element.

To conclude, the Court finds that Petitioner fails to show deficient performance on the part of his trial counsel in litigating the issue of insufficient evidence.   Further, because the state court did not unreasonably apply *Strickland* in determining that Petitioner could not prove prejudice, the state court's overarching conclusion is entitled to deference.   Accordingly, Petitioner's claim to ineffective assistance of counsel on this basis is **DENIED**.

*IV.    CONCLUSION*

For the foregoing reasons, the Court **OVERRULES** Petitioner's objections (ECF No. 16),

**ADOPTS** the PF&R to the extent consistent with this Memorandum Opinion, (ECF No. 15),

**GRANTS** Respondent's Motion for Summary Judgment (ECF No. 9), **DISMISSES** the § 2254

Petition, and **DIRECTS** the Clerk to remove this case from the Court's docket.

The Court has also considered whether to grant a certificate of appealability.    *See* 28

U.S.C. § 2253(c).    A certificate will be granted only if there is "a substantial showing of the denial

of a constitutional right."    *Id.* at § 2253(c)(2).    The standard is satisfied only upon a showing that

reasonable jurists would find that any assessment of the constitutional claims by this Court is

debatable or wrong and that any dispositive procedural ruling is likewise debatable.    *Miller–El v.*

*Cockrell*, 537 U.S. 322, 336−38 (2003); *Slack v. McDaniel*, 529 U.S. 437, 484 (2000); *Rose v. Lee*,

252 F.3d 676, 683 (4th Cir. 2001).    The Court finds that some of the rulings made herein are

debatable and therefore **GRANTS** a certificate of appealability on two of the three issues made

the subject of Petitioner's objections: first, the voluntariness of his October 4, 2010 statement to

law enforcement, and second, the effectiveness of trial counsel in cross-examining Dr. Mock.

As to the claim that his counsel rendered ineffective assistance in litigating the sufficiency

of the evidence, the Court finds that Petitioner has not made a substantial showing of the denial of

a constitutional right and **DENIES** a certificate of appealability.    Pursuant to Rule 11(a) of the

Rules Governing Proceedings Under 28 U.S.C. § 2254, Petitioner may not appeal the Court's

denial of a certificate of appealability, but he may seek a certificate from the court of appeals under

Federal Rule of Appellate Procedure 22.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        September 30, 2016

_____

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE